BRUCE'S JUICES, INC. *v.* AMERICAN CAN CO.

No. 27. Reargued November 14, 1946.—Decided April 7, 1947.

---

*Cody Fowler* and *Thurman Arnold* reargued the cause for petitioner. With them on the brief was *R. W. Shackleford.*

*John Lord O'Brian* reargued the cause for respondent. With him on the brief were *Leonard B. Smith, John M. Allison* and *Harry B. Terrell.*

*Solicitor General McGrath, Assistant Attorney General Berge, Charles H. Weston, Philip Marcus* and *Philip Elman* filed a brief for the United States, as *amicus curiae,* in support of petitioner.

MR. JUSTICE JACKSON delivered the opinion of the Court.

The federal question which survives proceedings in the Florida state courts is whether renewal notes representing the purchase price of goods sold and delivered are uncollectible if it is found that the vendor violated the Robinson-Patman Act, 49 Stat. 1526, 1528; 15 U. S. C. §§ 13, 13a.

Bruce is a canner and, over a period of years, bought its cans chiefly from The American Can Company. A debt accumulated which was put into promissory notes and on one or more occasions they were renewed, reduced by amounts which had been paid. Upon eventual default, two suits, later consolidated, were brought on renewal notes aggregating about $114,000. As to each note, Bruce pleaded in defense that "the consideration for said notes is illegal and said notes void and of no force and effect." This was said to be for the reason that the Can Company had sold to others at prices which discriminated against Bruce and thereby violated the Robinson-Patman Act.

The alleged discrimination chiefly relied upon consisted of quantity discounts. Annual purchases by Bruce

were about $350,000. Some other canners bought much larger quantities. The Can Company's contract with all its customers allowed a discount of 1% on annual purchases of $500,000, and nothing to those whose purchases were less than that. It was so graduated as to give a maximum discount of 5% to a customer whose purchases were $7,000,000 a year. The consequence is that relatively small packers pay 5% more for their cans than their largest competitors.

It is claimed that this advantage to quantity buyers renders the quantity discount *per se* a violation of the Robinson-Patman Act. To sustain the defense in this case it would be necessary to so hold. It is not denied that Bruce got the same discounts as other purchasers of like quantities when it qualified, and in one year Bruce was in the $500,000 bracket and received the 1% discount. It is not claimed that the Can Company failed to give discounts where earned under this uniform contract, or that discounts were given where not so earned. Bruce received the same discounts as others within its classification and it is not questioned that had it been a purchaser of larger quantities it would have been allowed the same discount as other purchasers of that class.

Before a court could sustain the defense in this particular case, it would also have to overcome other difficulties of law and fact. The Act does not prohibit all quantity discounts but expressly permits them under certain conditions. It indicates, too, that the Federal Trade Commission is the appropriate tribunal to hear in the first instance the complicated issues growing out of grievances against a quantity discount practice of a seller. 49 Stat. 1526; 15 U. S. C. § 13 (a). Quantity discounts are among the oldest, most widely employed and best known of discount practices. They are common in retail trade, wholesale trade, and manufacturer-jobber relations. They are common in regulated as well as unregulated

price structures. Congress refused to declare flatly that they are illegal. They become illegal only under certain conditions and when they are illegal it is as much a violation to accept or receive as to allow them. Bruce, in one of the years included in its balance of account, purchased more than a half million dollars of cans on which it received precisely the kind and amount of discount it now asserts to be illegal.

The argument is made that such a remedy as Bruce seeks here would support the anti-monopoly policy of Congress. But Bruce is not complaining of the high price of cans. Bruce complains of a lower price for cans to others—which would enable competitors to put their products on the market cheaper. This may well put Bruce to some disadvantage, but it does not follow that Congress would forbid the savings of large-scale mass production to be passed along to consumers. The economic effects on competition of such discounts are for the Trade Commission to judge. Until the Commission has determined the question, courts are not given guidance as to what the public interest does require concerning the harm or benefit of these quantity discounts on the ultimate public interests sought to be protected in the Act. It would be a far-reaching decision to outlaw all quantity discounts. Courts should not rush in where Congress feared to tread.

Because of a more fundamental defect in petitioner's case, however, the Court does not find it necessary to consider the effect of these features of the Act on this case, as would be necessary before a conclusion could be reached that petitioner should win on the merits. On the questions of fact, considerable evidence was taken at pre-trial hearings and the parties are in dispute as to whether the decision thereon was a final judgment and, if so, as to whether the defense was not also adjudicated to be insufficient on the facts. Although the record is unsatisfactory,

we take it that all of the sales evidenced by the notes were made after the passing of the Robinson-Patman Act. It appears, however, that the notes are not identified with any particular sale but represent a balance remaining on a running account of sales and credits in many of which a claim of discrimination might not be supportable. The indebtedness they supplant is conceded to have been incurred before February, 1940. The purchases covered at least a four-year period and involved two types of cans. The purchase price which Bruce asks us to excuse it from paying is not identified either as to type of can or date of transaction. But petitioner contends that it is not necessary in proving a discrimination to show that others received a different discount on the same type of can at approximately the same time "because the scheme of discount by aggregate dollar volume of annual sales comprehends all cans bought whatever their size or price." To sustain this position would mean that a sale to a competitor of large cans in 1940 at a higher discount invalidated a sale of small cans to petitioner in 1936 so that petitioner need not pay the contract price for cans delivered that year. The contention is simply that if some purchasers got larger discounts on any bill for cans than petitioner got, the bill against petitioner and notes in settlement and extension of it are uncollectible.

However, for the purposes of this decision, in view of the uncertain nature of the proceedings below, we assume, but do not decide, that the defense on the facts has been or could be established as pleaded. We do not decide whether the quantity discount plan, whatever the facts were, violated the Robinson-Patman Act. The sole question we decide is whether notes given for purchases are unenforceable if the quantity discount plan violates the Act. Petitioner suggests that the Court may take two paths to the answer, but that the answer will be yes. The

broad ground petitioner offers is "that a transaction un-
lawful under the Robinson-Patman Act constitutes crim-
inal conduct upon which no money judgment can be
based." Petitioner also offers a narrow ground on which
we can yet decide in its favor. "But, if it be admitted
that the buyer [sic] is entitled to the fair value of the
goods," petitioner says, respondent probably already has
been paid the fair value of all the cans bought in 1936–40.
When that value has been determined by the trial court,
it urges, it will be found that the amount in notes is sub-
stantially equivalent to the amount of discrimination in
discount.[1]

In effect, petitioner is treating the $114,000 in notes
as representing the discount it claims it should have gotten
on its 1937–42 purchases of $2,000,000. This alternative
argument is that petitioner is liable only for the fair value
of all the cans it bought, and in this suit it asks the courts
to determine what that fair value was. But the fact is
that as to the transactions for which petitioner paid
$2,000,000 it has already paid the agreed price. Those
transactions cannot be identified with particularity, but
they were paid for at respondent's prices. Petitioner did
not allege and does not contend that the notes represent
specific transactions or that the sales for which they were
given could be identified. Mr. Bruce conceded in his tes-
timony that the notes simply represent a balance of an
account which mingled the prices of individual transac-

---

[1] On petitioner's first theory, clearly no recovery on *quantum meruit*
could be had. The general rule is that a transaction wholly illegal
will not support such a suit. See Williston, Contracts (Rev. ed., 1938)
§ 1786A; Restatement, Contracts, § 598, Comment *c*. And on Bruce's
second theory, because of the leniency with which respondent extended
credit, it would be impossible for respondent to show which cans the
notes represent and it would of course be unable to establish their fair
value. If we hold the notes uncollectible, therefore, respondent could
not recover on *quantum meruit,* and Bruce would get a windfall.

tions.[2]  In its brief here, petitioner's only response to respondent's statement that "None of the original notes . . . had been tied to a particular transaction" is that "The record shows that all of the notes are tied to the entire series of transactions."  There may be substantial equivalence numerically in the amount of the notes and the amount of alleged discrimination, but it cannot be said that the notes represent the separate item of price discrimination.[3]

---

[2] His testimony on this point follows:

"Q. Mr. Bruce, do the notes evidence the purchase price of any particular size of cans you purchased from the American Can Co.?

A. There is nothing on the face of the notes that shows what size they were.

Q. During that period you purchased a certain size can?

A. It was purchased during a certain period.

Q. Did you run a separate account on the grocery can and on the soft drink can, or small and large?

A. No sir.

Q. The notes themselves simply represent that account, irrespective of the size of the cans?

A. Yes sir, the blanket way.

Q. In a blanket way.  In other words there was no distinction made in your account between the large and small cans, I mean in the indebtedness?

A. Not while the notes were accruing.

Q. In other words the notes in question are for the purchase price of both large and small cans?

A. That is right."

[3] If the notes are considered alternatively as representing respondent's price due on the latest purchases to that amount in late 1939 and early 1940, petitioner, on its theory, would be entitled to be excused payment of only about 5% of the $114,000, because it is defending on the ground that it ought not to pay the allegedly discriminatory part of the price.  But even for this limited purpose, it cannot be established what cans the $114,000 represents, so the court could not determine their fair value.

In *Penn-Allen Cement Co.* v. *Phillips & Southerland,* 182 N. C. 437, 109 S. E. 257, the specific sales were identified and the price unpaid.

The Act prescribes sanctions, and it does not make uncollectibility of the purchase price one of them. Violation of the Act is made criminal and upon conviction a violator may be fined or imprisoned. 49 Stat. 1528, 15 U. S. C. § 13a. Any person who is injured in his business or property by reason of anything forbidden therein may sue and recover threefold the damages by him sustained and the costs of suit, including a reasonable attorney's fee. 38 Stat. 731, 15 U. S. C. § 15. This triple damage provision to redress private injury and the criminal proceedings to vindicate the public interest are the only sanctions provided by Congress.

It is contended that we should act judicially to add a sanction not provided by Congress by declaring the purchase price of goods uncollectible where the vendor has violated the Act. It may be admitted as argued that such a sanction would be an effective enforcement provision. Addressed to Congress, this argument might be persuasive, but the very fact that it would obviously be an effective sanction makes it even more significant that

The court there held only that the buyer should be excused payment of the discriminatory part of the contract price. But the opinion was given after the court had decided that the appeal was prematurely taken.

The defendant had counterclaimed for treble damages, computed on the basis of the alleged overcharge. The plaintiff urged that treble damages could not be recovered in an action for the purchase price but that the defendant must pay first, and then sue on that claim. The court said simply, "This matter also has not been passed upon by the court below, and there is nothing for us to consider." 182 N. C. at 441, 109 S. E. at 259. But if the court was right in holding that plaintiff could not recover the overcharge, it would necessarily follow that the counterclaim should have been dismissed. For without paying the overcharge, the defendant would have had no basis on which to rest its claim that it had been damaged in that amount and therefore entitled to treble compensation.

the Act made no provision for it; that no committee dealing with the Robinson-Patman Act proposed it; that not one word suggesting its consideration appears in the debates of Congress; no proponent of the Act pointed out in its favor that it would be self-enforcing because of this sanction; and no opponent pointed with alarm to the consequences of such a drastic sanction on the commerce of the nation. On the contrary, a proposed provision of the Act, passed only by the Senate which later receded, shows that Congress gave consideration to no sanction more extreme than to compel the remission of the excess charged. See S. 3154, § 2 (d), 74th Cong., 1st Sess., S. Rep. No. 1502, 74th Cong., 2d Sess., p. 8: Conference Rep., H. Rep. No. 2951, 74th Cong., 2d Sess., p. 8. Congress declined to adopt this relatively moderate provision and at no time does it appear that either house of Congress wanted to go so far as to permit a buyer to get goods for nothing.

Where the interests of individuals or private groups or those who bear a special relation to the prohibition of a statute are identical with the public interest in having a statute enforced, it is not uncommon to permit them to invoke sanctions. This stimulates one set of private interest to combat transgressions by another without resort to governmental enforcement agencies. Such remedies have the advantage of putting back of such statutes a strong and reliable motive for enforcement, which relieves the Government of cost of enforcement. Such private remedies lose, of course, whatever advantage there may be in the presumed disinterested, public interest standards and expertness of a governmental agency which has the initiative control of retributory measures. It is clear Congress intended to use private self-interest as a means of enforcement and to arm injured persons with private means to retribution when it gave to any injured

party a private cause of action in which his damages are to be made good threefold, with costs of suit and reasonable attorney's fee.

Bruce, it appears, already has undertaken the triple damage suit remedy against the Can Company. *Bruce's Juices, Inc.* v. *American Can Co.*, No. 569, Civ. T., S. D. Fla., 1942. To indicate its need that the Court establish this additional remedy unauthorized by Congress, it seeks to discredit and belittle both of the remedies Congress has expressly authorized. It says, "The triple damage suit is likely to prove protracted and expensive; damages caused by a disadvantageous competitive position are so speculative as to be usually unprovable. Nor can the buyer rely for protection upon the action of the government. The Department of Justice or the Federal Trade Commission may never get around to the matter." It is a little dubious whether the sort of remedy which has been in litigation over four years in this case which Bruce asks us to reverse and send back again, is an antidote for "protracted and expensive" triple damage suits. Moreover, if Bruce can in this suit prove that the prices respondent charged were illegal, as it must in order to win, it can do the same in a triple damage suit. The damages sustained because of discrimination are no more "speculative" nor "unprovable" in one suit than in the other, and their establishment in the statutory form of action carries a bonus.

Annexation of the proposed defense to the statute by implication either as an inference of unexpressed intention of Congress or as the result of some doctrine of common law, would be justified only if it would be at least a rational, nondiscriminatory and appropriate means of making the policy of the statute effective. To allow a buyer to get his goods for nothing because the seller violated the Act by giving someone else a greater discount, does not meet this test.

It would seem that one test of the rationality and appropriateness of such a defense because of a violation of the Act would be that the reparation it permits should be measured at least roughly by the extent of the injury caused by the violation. This, of course, is the principle of the suit for triple damages. But that is not the principle of the defense here urged. The extent of its indemnity is not measured by injury, and not measured by the dealings affected with the alleged violation. It is measured solely by the amount of credit the buyer obtained from the seller. The seller would lose the amount carried in notes or in open account. Had Bruce's delinquency been greater, so would its gain; had there been no credit asked or given the buyer could have had no remedy by way of defense. The obvious consequence would be to discourage vendors from extending credit where the operation of this rather difficult statute is in doubt. Since the danger of loss under the proposed remedy is greatest in the case of small buyers who get small discounts, the consequence would be to deny the small buyers credit and trust only those who, having the largest discounts, would be least likely to defend on a claim of violation. This result would hardly comport with the argument, so much dwelt upon by petitioner, that its status is that of a small business concern trying to battle a business giant. But we cannot suppose that "little fellows" are always buyers and only giants sell goods. Bruce itself is a seller of canned goods and if its trade practices include quantity discounts, this "little" canner might be on the other side of the same issue trying to collect against a small wholesaler who had less discount than a larger one. To decide issues of law on the size of the person who gets advantage or claims disadvantage is treacherous.

This construction which would make a grant of credit a point of vulnerability could be avoided only by holding that the whole purchase price, not merely that involved

in the credit, is uncollectible and recoverable even if voluntarily paid. In that case, the volume of the transaction, rather than the volume of the credit extended, would measure the loss a seller might suffer from violating the Act.

But, of course, if the discount system of the Can Company makes all of the Bruce purchases illegal and the price thereof recoverable, all sales to others under the discount system must be similarly tainted. It is hard to see how any of the Can Company's sales are valid if these to Bruce are void on the theory advanced. If this view is taken, certainly the remedy would soon end illegal quantity business discounts—by ending the business. We do not believe Congress has contemplated so deadly a remedy or has left the way open to us by judicial edict to dislocate business as such a holding would do. It must not be forgotten that such a decision would have retroactive effect for several years and unsettle many accounts. We cannot justify a judicial declaration to this effect.

But if only a few cases are to be unsettled—those, say, in positions similar to Bruce's—what becomes of the policy of nondiscrimination? Other canners who have paid cash find themselves competing with Bruce who is absolved from paying for a very large part of its cans—something like one-third of its annual dollar volume being involved in this case. In other words, as penalty for establishing a uniform one to five percent discount, the Can Company would be obliged to give Bruce something over a 30% discount on one year, or about 5% on all purchases shown by the evidence ever to have been made.

It is urged that holdings under the Sherman Antitrust Act supply an analogy for allowing this defense under the Robinson-Patman Act. The former provides, among other things, that every contract in restraint of trade or commerce "is hereby declared to be illegal." 26 Stat. 209,

50 Stat. 693, 15 U. S. C. § 1. This Court has held that where a suit is based upon an agreement to which both defendant and plaintiff are parties, and which has as its object and effect accomplishment of illegal ends which would be consummated by the judgment sought, the Court will entertain the defense that the contract in suit is illegal under the express provision of that statute. *Continental Wall Paper Co.* v. *Louis Voight and Sons Co.*, 212 U. S. 227. *Cf. Sola Electric Co.* v. *Jefferson Electric Co.*, 317 U. S. 173. But when the contract sued upon is not intrinsically illegal, the Court has refused to allow property to be obtained under a contract of sale without enforcing the duty to pay for it because of violations of the Sherman Act not inhering in the particular contract in suit and has reaffirmed the "doctrine that 'where a statute creates a new offense and denounces the penalty, or gives a new right and declares the remedy, the punishment or the remedy can be only that which the statute prescribes.' " *D. R. Wilder Mfg. Co.* v. *Corn Products Refining Co.*, 236 U. S. 165, 174–175; *Connolly* v. *Union Sewer Pipe Co.*, 184 U. S. 540.

Moreover, no single sale can violate the Robinson-Patman Act. At least two transactions must take place in order to constitute a discrimination. Thus, a contract may be made today which has no legal defect under the Robinson-Patman Act. A week later, another sale may be made at a different price or at a different discount, and the latter taken into consideration with the former may establish a discrimination. Whether a sale would be rendered void only because of simultaneous discrimination or preexisting ones, or whether a contract valid when made becomes void by reason of later transactions, and, if so, how much later, are questions we need not decide now. It is plain that the violation, if there was one, is not inherent in the contract sued upon, whether it be the notes or the sale of the goods, but can only be found in different trans-

actions which a party to the litigation had with third persons who are not parties. No such defense has been approved under the Sherman Act, and, furthermore, these characteristics show that the entire basis for judging under the two Acts is different and that the case law as to the Sherman Act does not fit the Robinson-Patman Act.

None the less, we are urged to supply judicially the sanction of invalidating obligations to pay for goods sold and delivered because, it is said, otherwise the courts become parties to the enforcement of a discrimination. If, in order to prove his own case, a plaintiff proves his violation of law, then no court will aid the plaintiff to recover.[4] Here, however, what the plaintiff must show is the notes which import consideration. If consideration is denied, he can prove that cans were sold and delivered at a stated price. That is no violation of law. It is only when the Court goes outside of the dealings between plaintiff and defendant and it is proved that the same kind of cans were sold to others at different prices within a relevant period of time, amounting to a discrimination—a fact unnecessary to sustain the plaintiff's cause of action— that the basis of the defense asserted here appears. The Court does not give its approval to transactions between one of the litigants and a third party just because it holds them irrelevant in this litigation.

The defendant's claim to be freed of the obligation to pay his promissory note because the payee, as vendor of cans, made sales to others that when compared with sales

---

[4] In *McMullen* v. *Hoffman*, 174 U. S. 639, for example, the Court refused to enforce a partnership contract which was based on an illegal and fraudulent agreement to submit collusive bids for public construction. The plaintiff argued that the partnership contract itself did not disclose any illegality, but even that was questionable. The Court, moreover, held that the agreement to be partners could not be separated from the general collusive agreement which gave rise to it  Agreements with third persons, not parties to the suit, however, were not relied upon by Court or litigants.

to itself may be held unlawfully discriminatory, cannot be supported as resting on any congressional word or policy. Not only was this remedy not named by Congress, but it would be surprising if it had been, in view of the remedies Congress did give. We have assumed for the purposes of this case that petitioner could establish that the prices respondent charged were discriminatory so that they violated the Act. But if petitioner can show that, clearly it would be entitled to recover in a triple damage suit supported by the same evidence. For despite petitioner's plaint on the difficulty of proving damages, it would establish its right to recover three times the discriminatory difference without proving more than the illegality of the prices. If the prices are illegally discriminatory, petitioner has been damaged, in the absence of extraordinary circumstances, at least in the amount of that discrimination. No reason suggests itself why Congress should have intended a remedy by which the victim of discrimination could recover by defense only one-third of what he could recover, on the same proof, by offense. The inducement of thrice the damages suffered may bring the sufferer to aid in enforcement of the statute. To assure his help, however, it would hardly be thought appropriate to offer him the choice of taking only one-third that amount. Since the remedy embodied in petitioner's second theory would be but a weak one-third shadow of the one Congress expressly gave, we cannot see the need for judicial reduplication in miniature. We hold that federal law does not support the defense alleged and the judgment of the Florida Supreme Court is

*Affirmed.*

Mr. Justice Murphy, dissenting.

The issue in this case is whether sellers of goods should be allowed to use the courts to collect price differentials which have been made illegal by Congress in the Robinson-

Patman Act. The Court approaches but never quite meets that issue. But the unmistakable effect of the Court's decision is to permit the recovery of discriminatory prices despite the plain language and policy of the Act and despite the lessening of competition that might thereby result. I remain unconvinced, however, that such a result is consistent with the high ideals of our judicial system or that it is made necessary by any rule of law or policy.

Section 3 of the Act makes it unlawful for any person to be a party to any sale which discriminates, to his knowledge, against competitors of a purchaser by granting to that purchaser "any discount, rebate, allowance, or advertising service charge" not available to the competitors in respect of a sale of goods of like grade, quality and quantity. 15 U. S. C. § 13a. Section 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act, makes it unlawful for any person "to discriminate in price between different purchasers of commodities of like grade and quality" where the result is to lessen competition or to tend to create a monopoly. 15 U. S. C. § 13 (a). It is in light of these statutory provisions that we must examine the opinion of the Court.

1. The Court proceeds on the basic assumption, unsupported by the record or by petitioner's contentions, that the petitioner is seeking to avoid all liability for the cans sold to it by the respondent. No such assumption is justified. Petitioner's brief, it is true, suggests two alternative theories in support of its position: (1) a transaction unlawful under the Robinson-Patman Act constitutes criminal action upon which no money judgment can be based; (2) discriminatory prices over and above the fair value of the goods cannot be collected by the seller. But petitioner does not pursue the first alternative, pointing out that only the second and narrower alternative is presented by the record. Thus the only contention really

before us is that promissory notes cannot be collected by legal action to the extent that they represent a price differential outlawed by Congress. As petitioner notes, this contention "does not require the Court to decide that the entire transaction is so tainted with illegality that the seller cannot collect even the fair value of the goods, thus giving the buyer a windfall." If the petitioner were to prevail in this case and the promissory notes were to be declared unenforceable, respondent would still be free to recover on a *quantum meruit* basis if it has not already so recovered. See *Penn-Allen Cement Co.* v. *Phillips & Southerland,* 182 N. C. 437, 109 S. E. 257.

Moreover, there is a strong indication that petitioner already may have paid the respondent the fair value of the cans. Since the passage of the Robinson-Patman Act, petitioner has had a continuing account with the respondent; under that account, petitioner paid respondent more than $2,000,000 for cans during the period from 1937 to 1942. When this suit was instituted, petitioner owed a balance of $114,000 on this account, represented by the promissory notes in issue here. To deny enforceability to those notes might thus affect only the discriminatory price differential, which the Court assumes violated the Robinson-Patman Act.

It also appears that the quantity discounts in issue were based upon the aggregate dollar value of annual sales rather than upon individual transactions. The discriminatory differentials had a like basis. Hence it is enough if petitioner can prove that the $114,000 in notes represents an illegal differential from this over-all standpoint.

The Court states, however, that the transactions represented by the $114,000 cannot be identified and that this figure cannot be said to reflect the separate item of price discrimination. But such sentiments are necessarily premature in the present posture of the case; petitioner

has not yet had a full opportunity to present all its evidence or to try to connect the notes with a discriminatory differential. Petitioner concededly has the burden of proving that the $114,000 in notes does represent the discriminatory part of the purchase price, whether in relation to specific transactions or to the aggregate dollar volume of annual sales. If it cannot so prove, its case collapses. The important and the only point now is that petitioner should be given the chance to prove this defense. We should not shut the court's door in petitioner's face before it has had that chance. Nor should we prejudice that defense by holding or intimating that proof is impossible. Certainly the right to offer and prove a defense is not to be denied because a court thinks that the purported defense has not yet been proved. It is one thing to raise a defense; it is quite another to prove it. Since we are concerned here only with the first proposition, it is beside the point whether the defense has been or can be proved.

We may thus dismiss as unwarranted the Court's fear that petitioner is going to get something for nothing if its contention is sustained. It is pleading only for the right to defend against the collection of that which Congress has declared illegal.

2. Equally irrelevant is the Court's inquiry into whether Congress "wanted to go so far as to permit a buyer to get goods for nothing" where the Robinson-Patman Act has been violated. In the case before us, the only relevant inquiry is whether the Robinson-Patman Act was designed to allow sellers to recover illegal price differentials through court action. A determination that the Act precludes such a recovery does not involve a finding that the framers of the Act desired these sellers to forfeit all the value of the products on which they placed an illegal price differential. It involves simply a finding

that the language and policy of the Act frown upon the use of the courts to effectuate what Congress clearly made illegal.

3. The Court thinks it significant that the Robinson-Patman Act makes no provision for a buyer interposing the vendor's violation of the Act as a defense to a suit by the vendor. It is said that the triple damage actions and the criminal proceedings are the exclusive sanctions provided by Congress for the enforcement of the Act.

This overlooks the fact, however, that a specific statutory provision is unnecessary to make an illegal contract unenforceable in the courts. Where a contract is outlawed by statute or is otherwise contrary to public policy, the illegality may be set up as a defense to a suit for enforcement despite the absence of a legislative recognition of that defense. Otherwise the courts would become parties to the illegality by sanctioning the enforcement of the unlawful agreements. *McMullen* v. *Hoffman,* 174 U. S. 639, 669–670. This principle has been applied many times by this Court. At an early date it was recognized that, despite the absence of a provision in the Sherman Act authorizing a defense of illegality in a private suit on a contract, such a defense might be used, that "any one sued upon a contract may set up as a defence that it is a violation of the act of Congress, and if found to be so, that fact will constitute a good defence to the action." *Bement* v. *National Harrow Co.,* 186 U. S. 70, 88. *Continental Wall Paper Co.* v. *Voight & Sons Co.,* 212 U. S. 227. Similarly, without specific statutory permission, private litigants have been allowed to invoke the policy of the antitrust laws so as to limit the scope of patent rights. *Mercoid Corp.* v. *Mid-Continent Co.,* 320 U. S. 661; *Sola Electric Co.* v. *Jefferson Electric Co.,* 317 U. S. 173; *B. B. Chemical Co.* v. *Ellis,* 314 U. S. 495; *Morton Salt Co.* v. *Suppiger Co.,* 314 U. S. 488; *Katzinger*

*Co.* v. *Chicago Mfg. Co.,* 329 U. S. 394; *MacGregor* v. *Westinghouse Co.,* 329 U. S. 402.

And so when a contract or promissory note is tainted with a violation of the Robinson-Patman Act, its enforcement should be refused by a court, at least to the extent of the illegality involved. The failure of Congress to mention such a sanction slips into insignificance in the light of precedents in analogous situations.

4. The Court holds, however, that the Robinson-Patman Act invalidates discrimination rather than contracts of sale at discount and that the analogy of denying the enforcement of contracts violative of other antitrust laws is imperfect.

But such a holding misconceives the very nature of the Robinson-Patman Act and the evils at which it was directed. No one contends that the Act makes illegal all contracts of sale at a discount. Nor does any one deny that an illegal discrimination becomes apparent only after there have been two or more sales. As the Court states, a contract may be made today which has no legal defect under the Robinson-Patman Act. But once there are two or more sales and once there has been illegal discrimination, the illegality may reach back to the first transaction, which was free of all defects when made. That is inherent in the very nature of discrimination and it should not surprise us to discover that fact. Discrimination may thus become evident in contracts, promissory notes, open accounts and other forms of indebtedness. And it may put in a tangible appearance when a subsequent suit is brought to recover, among other things, what has proved to be an illegal price differential. To deny effect to that discrimination in a suit by the vendor does not require that a court hold void the entire transaction and permit the buyer to retain the goods free of any charge. It requires only that the court refuse to permit the recovery of that part of the

purchase price which discriminates against the buyer who purchased the same kind and quality of goods as his competitors.

Thus that part of a contract of sale permitting a certain discount may be or become illegal if the purchaser's competitors are given larger discounts. Such is the whole tenor and policy of the Robinson-Patman Act. And collection of the discriminatory differential falls squarely within the area of illegality defined by the statute. Indeed, the Act is shorn of much of its meaning if the vendor is permitted to recover the fruits of his unlawful conduct. Courts should not be used for that purpose any more than they should be used to sanction recovery on contracts made wholly void by the Sherman Act. In the one case, courts are asked to give judgment for an unlawful price differential; in the other, they are asked to enforce a monopolistic agreement. In both cases, the answer should be a strong negative. The Acts are part and parcel of the same legislative policy, the Robinson-Patman Act merely elaborating some of the more subtle and refined monopolistic practices which Congress desired to eliminate. Courts should treat them accordingly.

It is no answer to say, as the Court does, that we must go outside the transaction in issue in order to give effect to a defense of unlawful discrimination. Of course that must be done, for discrimination is a relative matter depending upon the vendor's transactions with third parties. But such an inquiry must be made by a court in suits for triple damages under the Robinson-Patman Act. *American Can Co.* v. *Ladoga Canning Co.*, 44 F. 2d 763. And an inquiry of that type must frequently be made in private suits where defenses are made under the Sherman Act. Discriminations and monopolies rarely if ever appear on the face of documents which are introduced for purposes of securing a recovery in a court of law. Judges con-

stantly must look beyond the particular documents in issue. Surely, if it be assumed that a particular discount is unlawful, no factor of inconvenience or burden in looking at other transactions can justify ignoring the illegality and permitting an unwarranted recovery. And to insist that recovery must be allowed if the plaintiff shows no violation of law in proving the amount due on a promissory note is to hark back to medieval concepts of pleading and practice. The Robinson-Patman Act deals with complex economic realities. Litigants and judges must act accordingly when the Act is properly brought into issue by a defendant. If the policy of the Act is to be respected, the transaction before the court must be judged on the basis of other dealings by the vendor despite the superficial perfection of the vendor's pleadings and proof.

Nor is recovery to be denied because only part of the illegality may be in issue. Courts must strike down illegality wherever it appears. Statutory violations are not to be countenanced merely because the violator seeks to reap only part of his illegal harvest at a time.

5. The Court intimates, without actually deciding, that courts should not allow this type of defense to be raised until the Federal Trade Commission has determined the economic effects of quantity discounts on competition. The fear is expressed that without the Commission's guidance, courts might strike down all quantity discounts and create untold retroactive liabilities.

The short answer is that we should be reluctant to assume that judges are unable to comprehend the Robinson-Patman Act and the standards it sets up in regard to quantity discounts. It may be granted that the Federal Trade Commission has more technical knowledge and experience in dealing with the complexities of this problem than most courts; and the Commission's judgment would be of inestimable value to any judge called upon to deal

with quantity discounts. But in the absence of some action by the Commission, courts must act as best they can within the framework provided by Congress. The Act, 15 U. S. C. § 13 (a), specifically recognizes that quantity discounts are illegal only where they lessen or injure competition or tend to create a monopoly; and where price differentials are justified by differences in costs of manufacture, sale or delivery, the discounts are permissible. This matter is a complex one, but it is no more complex than many other problems which face the courts.

The only alternative to the Court's apparent position in this respect is for judges to sit idly by and allow sellers to collect illegal price differentials—a function that hardly qualifies as an ideal toward which we should strive. Indeed, if the Court's conception of the judicial function in suits of this nature is to be carried to its logical conclusion, judges would abdicate all their duties under the Robinson-Patman Act whenever the Federal Trade Commission has failed to express an opinion on the subject in issue. They would refuse to entertain treble damage suits and would dismiss all criminal indictments brought on the basis of an alleged violation of the Act. It seems to me, however, that the judicial process has more vigor and responsibility than the Court seems willing to imply in this case.

6. Finally, the Court indicates that the fact that petitioner is a small business concern is a treacherous basis for deciding issues of law. As a general proposition, there can be no dispute with that attitude. But we must not blind ourselves to the equally important fact that the antitrust laws, of which the Robinson-Patman Act is an integral part, are designed primarily to aid the small business concerns and to curb the growth of giant monopolies. Many years ago this Court had occasion to point out that trade and commerce may be "badly and unfortunately re-

strained by driving out of business the small dealers and worthy men whose lives have been spent therein, and who might be unable to readjust themselves to their altered surroundings. Mere reduction in the price of the commodity dealt in might be dearly paid for by the ruin of such a class, and the absorption of control over one commodity by an all-powerful combination of capital." *United States* v. *Trans-Missouri Freight Assn.*, 166 U. S. 290, 323. The same observation applies to this case. The Robinson-Patman Act was designed in large part to protect the small business concerns, Congress realizing the disastrous effects of their being the victims of discriminatory prices. A proper treatment of the Act demands appreciation of this purpose.

We should pause long before sanctioning the recovery of discriminatory prices which Congress has found inimical to the nation's welfare. We should be on guard against the use of the judicial process to augment the subtle destruction of small business contrary to the legislative will, and the erosion of the barriers which Congress has erected against the flood-tide of monopoly. To that end, therefore, we should reverse the judgment below and allow courts to give full effect to the Robinson-Patman Act.

MR. JUSTICE BLACK, MR. JUSTICE DOUGLAS and MR. JUSTICE RUTLEDGE join in this dissent.