54 N.J. Super. 224 (1959)
148 A.2d 599
LOEW'S INCORPORATED, PLAINTIFF-RESPONDENT,
v.
SOMERVILLE DRIVE-IN THEATRE CORPORATION, DEFENDANT-APPELLANT, AND
SEVEN OTHER CONSOLIDATED ACTIONS: PARAMOUNT FILM DISTRIBUTING CORPORATION, WARNER BROS. PICTURES DISTRIBUTING CORPORATION, TWENTIETH CENTURY-FOX FILM CORPORATION, UNITED ARTISTS CORPORATION, COLUMBIA PICTURES CORPORATION, UNIVERSAL FILM EXCHANGES, INC., RKO TELERADIO PICTURES, INC., PLAINTIFFS-RESPONDENTS,
v.
SAME DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued January 19, 1959.
Decided February 18, 1959.
*226 Before Judges GOLDMANN, FREUND and HANEMAN.
Mr. Monroe E. Stein argued the cause for appellant.
Mr. Willard G. Woelper argued the cause for respondents (Messrs. Toner, Crowley, Woelper & Vanderbilt, attorneys; Messrs. Sargoy & Stein (Mr. Edward A. Sargoy and Mr. John F. Whicher) of New York Bar, of counsel).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
This is an appeal, taken by leave granted pursuant to R.R. 2:2-3, from an order of the Superior Court, Law Division, striking as insufficient in law (R.R. 4:12-6) the affirmative defense interposed in each of eight consolidated actions. Four were commenced in the district court and the rest in the Law Division; all eight were consolidated in the Superior Court. The cases present identical questions of law and fact.

I.
Plaintiff in each case is a distributor of motion pictures and is suing defendant, which operates a drive-in motion picture theatre in Somerville, N.J., for the balance of license fees allegedly due under license agreements for the exhibition of plaintiff's films. The complaints are identical except for plaintiff's name and the amount of damages sought. We may therefore treat one complaint as typical *227 of the others and, for the moment, refer to the respective plaintiffs as "plaintiff."
The complaint, as amplified by the pretrial order, alleges that plaintiff, by means of license agreements, granted defendant the right to exhibit at its theatre and at certain fixed times various copyrighted motion pictures distributed by it. Defendant was to pay a license fee, known as a percentage rental, in an amount determinable by a percentage of the gross box office receipts. Defendant's original admission charge was 70¢ for each patron over 12 years of age. Beginning with the fall of 1954 defendant concededly charged 80¢, except for certain brief periods. In accounting to plaintiff for gross box office receipts for the purpose of computing and paying percentage rentals, defendant reported its receipts at only 70¢ per patron. Plaintiff claims the unpaid percentage balance due on the remaining 10¢. Defendant alleges that the unreported 10¢ represented a charge to patrons for the use of car heaters supplied during cold weather, or for the privilege of their children's use during the summer months of a small playground located on the theatre premises. It contends that such charges should not be considered part of the admission fee. Defendant concedes that if this contention is not upheld, the eight plaintiffs will be entitled to claims aggregating $9,020.57. However, in addition to denying liability, defendant raises the affirmative defense that plaintiff cannot recover because the license agreements sued upon are illegal and unenforceable, in that they violate the Sherman Anti-Trust Act, 15 U.S.C.A. §§ 1 to 7, inclusive.
Plaintiffs distribute over 90% of the films available for exhibition at defendant's theatre. The business of distributing and licensing motion pictures is conceded to be in interstate commerce. The defense alleges that the "run" and "clearance" provisions in the license agreements "set the time when a theatre operator may exhibit a certain picture in relation to the time when said picture is exhibited in other theatres"; that these provisions are integral parts of the agreements and substantially affect the license fee terms; *228 and that "clearance" is legal only when reasonable. Defendant further alleges that it requested, but was refused, "a run free and clear of clearance over defendant's theatre from any other theatre"; that any run in its theatre which was based on clearance in favor of any other theatre, or which conditioned the time when defendant could exhibit a picture upon the time when any other theatre exhibited, or upon any fact other than the general release of the picture in New Jersey, is unreasonable, arbitrary and illegal. Defendant also claims that the refusal of the several plaintiffs to agree to license their pictures on the terms defendant had requested, was the result of a conspiracy among them (in which certain unnamed exhibitors also participated) to impose upon defendant a uniform system of runs and clearances which it was obliged to accept in order to obtain films. All these actions, it is alleged, effected an unreasonable restraint on interstate commerce, and hence violated the Sherman Act. Defendant demanded judgment dismissing the several complaints.
In granting plaintiffs' motion to strike the defense as insufficient, the trial judge held it to be settled law that
"* * * the contracts of an unlawful combination, or its members, which are collateral to and independent of the unlawful contract by which the conspiracy was created, and which are not in furtherance of its unlawful purpose, are valid and enforceable. It is generally agreed that the mere fact that the plaintiff is a member of an unlawful conspiracy or combination, created with the intent and purpose of restraining trade or establishing a monopoly, will not disable or prevent it in law from selling goods or services within or affected by the provisions of such trust or combination, and recovering their price or value, either at common law or under statutes making unlawful contracts in restraint of trade or commerce."
He concluded that the alleged illegality pleaded by defendant was collateral to the contracts in suit.

II.
Plaintiffs argue, and defendant readily concedes, that the system of staggered releases of motion pictures, whereby *229 certain theatres exhibit a particular picture ahead of others, i.e., on an earlier "run," is an economic necessity in the motion picture business and has judicially been sanctioned when reasonably employed. Fanchon & Marco v. Paramount Pictures, 100 F. Supp. 84, 89 et seq. (D.C.S.D. Cal. 1951), affirmed 215 F.2d 167 (9 Cir. 1954), certiorari denied 348 U.S. 912, 75 S.Ct. 293, 99 L.Ed. 715 (1955). It is also well settled that no exhibitor has a right, as a matter of law, to a priority of run. Paramount Pictures Theatres Corp. v. Partmar Corp., 97 F. Supp. 552, 559 (D.C.S.D. Cal. 1951), affirmed on opinion below 200 F.2d 561 (9 Cir. 1952), affirmed 347 U.S. 89, 74 S.Ct. 414, 98 L.Ed. 532 (1954), rehearing denied 347 U.S. 931, 74 S.Ct. 527, 98 L.Ed. 1083 (1954); Orbo Theatre Corp. v. Loew's, Inc., 156 F. Supp. 770, 779 (D.C.D.C. 1957). Defendant, however, insists that the clearance and run provisions inserted in the licenses in suit are unreasonable and arbitrary, and therefore illegal.
Clearance and run provisions in a film license contract fix the time when a theatre may exhibit the licensed picture. The meaning of "clearance" was set out in the leading case of United States v. Paramount Pictures, Inc., 66 F. Supp. 323 (statutory court D.C.S.D.N.Y. 1946); findings, conclusions and decree published in 70 F. Supp. 53 (D.C.S.D.N.Y. 1947); affirmed in part and reversed in part, 334 U.S. 131, 68 S.Ct. 915, 92 L.Ed. 1260 (1948). The lower court there said (66 F. Supp., at page 341):
"Among provisions common to the licensing contracts of all the distributor-defendants are those by which the licensor agrees not to exhibit or grant a license to exhibit a certain motion picture before a specified number of days after the last date of the exhibition therein licensed."
The United States Supreme Court in the same case (334 U.S. at page 144, 68 S.Ct. at page 923) said that "Clearances are designed to protect a particular run of a film against a subsequent run." In the findings of fact of the statutory court, reported in 70 F. Supp. 53, at page 54, *230 clearance is defined as "the period of time, usually stipulated in license contracts, which must elapse between runs of the same feature within a particular area or in specified theatres."
We note, in passing, that a clearance is not illegal per se, even though it may restrict trade to some extent. As was squarely held by the statutory court in United States v. Paramount Pictures, Inc., above, 66 F. Supp., at page 341 et seq.:
"* * * a grant of a clearance, when not accompanied by a fixing of minimum prices or not unduly extended as to area or duration, affords a fair protection to the interests of the licensee without unreasonably interfering with the interests of the public. * * * [L]icenses between one distributor and one exhibitor with reasonable clearance provisions do not, in our opinion, involve anything unlawful. Such provisions are no more than safeguards against concurrent or subsequent licenses in the same area until the exhibitor whose theatre is involved has had a chance to exhibit the pictures licensed without invasion by a subsequent exhibitor at a lower price. It seems nothing more than an adoption of the common law rule to restrict subsequent exhibitions for a reasonable time within a reasonable area." (The court was here referring to its comment that at common law "a vendor of income-producing property may validly covenant with his purchaser not to compete for a given time or within a given area so long as the restrictions are reasonably necessary to protect the value of the property purchased.")
This holding was left undisturbed on appeal, 334 U.S. at page 145, 68 S.Ct. at page 923. And see Fanchon & Marco v. Paramount Pictures, above, 100 F. Supp., at page 89. The rule accords with our law relating to negative restrictive covenants of a similar character. Voices, Inc. v. Metal Tone Mfg. Co., 119 N.J. Eq. 324 (Ch. 1936), affirmed 120 N.J. Eq. 618 (E. & A. 1936), certiorari denied 300 U.S. 656, 57 S.Ct. 433, 81 L.Ed. 866 (1937).
"Runs" are defined as "the successive exhibitions of a feature in a given area, first-run being the first exhibition in that area, second-run being the next subsequent, and so on." United States v. Paramount Pictures, Inc., 70 F. Supp., at page 55. In short, the "run" determines the sequence in which a theatre may exhibit a particular picture *231 with reference to the sequence of exhibition in other theatres which enjoy a prior run, and "clearance" sets the time which must elapse between the showing of the picture at different theatres.

III.
In elaboration of its affirmative defense, defendant contends that plaintiffs have violated the Sherman Anti-Trust Act in two separate and independent particulars: (1) the clearance and run provisions of the license agreements in suit are unreasonable and arbitrary, and hence illegal, even in the absence of a conspiracy between and among the several plaintiffs; and (2) the uniform clearance and run provisions inserted in license agreements were determined and imposed upon defendant as a result of a conspiracy and agreement to which all the plaintiffs were parties.
To meet the first branch of defendant's argument, plaintiffs use as their point of departure the definition of "clearance" given in the Paramount Pictures case, above, and argue that defendant mischaracterizes as "clearances" the contract provisions in suit. Clearances, they contend, are negative covenants in the exhibition contracts made by a distributor with prior-run exhibitors, to protect for limited times and within a certain area the exclusivity of the prior-run exhibition right therein granted. But the issue raised by the defense, they say, is actually directed toward the delivery date or availability of the film print, and not to the legal validity of any clearances granted in contracts with third parties for prior-run protection. Plaintiffs point out that defendant pleads no such clearance clauses in the contracts in suit; it does not claim that it agreed, conspiratorially or otherwise, with any plaintiff unreasonably to withhold any picture from any theatre, or that it made any negative covenants in its contracts to obtain exclusive and unreasonable protection by way of clearance for itself over later-run theatres. What it is claiming is that it was held back to a later delivery date or run than it desired, *232 because of unreasonable protective clearance granted to prior-run theatres. Plaintiffs state that such clearances, by definition, could only be found in the agreements between plaintiffs and such prior-run exhibitors.
Plaintiffs' argument, on first impression, carries a measure of persuasion. Since no exhibitor has a right, as a matter of law, to a priority of run, there could be no inherent illegality in a license agreement which fixes the availability or time for delivery of the film print licensed for exhibition. The contract and any breach thereof, say plaintiffs, can be established on its own account; one need not go outside the contract into other and collateral contracts and transactions. It is only when one finds a "clearance" provision as defined and described in the Paramount Pictures case, that one encounters anything in the nature of a restraint of trade.
There is language in the Paramount Pictures case (see 66 F. Supp., at page 341 and 334 U.S., at page 144, 68 S.Ct. at page 923, quoted above) that would appear to lend support to plaintiffs' argument that a true clearance provision can be found only in the license agreements of a prior-run theatre which grant that theatre clearance or protection over a subsequent-run theatre. In most anti-trust actions, the emphasis would probably be on agreements with prior exhibitors, in an effort to show that the protection granted thereby was unreasonable because unduly extended as to area or duration. However, our examination of the cases, particularly the Paramount Pictures case, nowhere reveals a statement by the court that clearance must be stipulated in the contracts of the prior-run theatre for whose benefit the clearance was granted. In considering clearances, the objectionable feature is the fact that there is an arrangement to give an unreasonably broad protection. The fact that the clearance appears in one document rather than another cannot reasonably or logically be considered material.
The definitions of "clearance" given in the briefs, all taken from Paramount, do not compel the narrow interpretation *233 advanced by plaintiffs. In that case the courts were concerned with clearance provisions that already appeared in contracts with preferred exhibitors, and references would naturally be to those contracts. In logic and in practice, clearance provisions may be expressed in license agreements with prior-run theatres which have the benefit of the clearance, or in those with later-run theatres on which the clearance is imposed. They might more informally be included in letter agreements, or even effected by verbal arrangements, with the understanding that the terms would subsequently be incorporated in the executed license agreements of a prior-run theatre, later-run theatre, or both. The search always is for evidence of clearance, no matter how or in what form expressed.
We pass to another aspect of the first branch of defendant's argument. Defendant rests its case for holding the so-called clearance and run provisions of the license agreements in suit illegal on the flat assertion that these provisions are in violation of section 1 of the Sherman Anti-Trust Act, even in the absence of a conspiracy between and among the several plaintiffs. This contention vitiates defendant's entire argument.
The question posed is simply this: whether an individual distributor's refusal to agree to license a particular theatre on any but a subsequent run can ever be illegal for any purpose, in the absence of conspiratorial or joint wrongful action with third parties underlying such refusal, under conditions which render that refusal unreasonable as a matter of law. The firmly established rule, as has already been indicated, is that an exhibitor has no right per se to a priority of run enforceable against an individual distributor under the anti-trust laws, Paramount Pictures Theatre Corp. v. Partmar Corp. and Orbo Theatres Corp. v. Loew's, Inc., above.
Section 1 of the Sherman Anti-Trust Act condemns "Every contract, combination * * * or conspiracy, in restraint of trade or commerce among the several States, * * *." 15 U.S.C.A. § 1. A plurality of actors is *234 required. Orbo Theatre Corp. v. Loew's, Inc., above, 156 F. Supp., at page 779; Fanchon & Marco v. Paramount Pictures, above, 100 F. Supp., at page 89; Kiefer-Stewart Co. v. Joseph E. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951), rehearing denied 340 U.S. 939, 71 S.Ct. 487, 95 L.Ed. 678 (1951). If each plaintiff, through sheer perversity, and acting independently, refused to grant runs to defendant except following an unreasonable clearance, there would be no ground for relief under the Sherman Act. In claiming the protection of the anti-trust laws against the imposition of allegedly unreasonable clearances upon its theatre, defendant must show as an essential part of its case that the clearances were imposed as the result of an agreement or some kind of joint action among the distributors, or between a distributor and a prior-run exhibitor or exhibitors. United States v. Paramount Pictures, Inc., above, did not, as defendant contends, hold to the contrary, for the illegality relating to runs and clearances which the decree in that case struck down was squarely rested upon findings of joint wrongful action. 70 F. Supp., at pages 62 and 71-72 (Findings of Fact Nos. 79-82, and Conclusions of Law Nos. 7(b), 8(c) and (e), and 9(c) and (d)). In our review of the cases cited by both parties we have found none where the court has undertaken to restrict a distributor's freedom individually to determine what run it will grant to an exhibitor. Only where the distributor conspires or acts jointly, either with other distributors or with one or more exhibitors, to impose a subsequent run upon an unwilling exhibitor under conditions deemed to be unreasonable as a matter of law, does the Sherman Act come into operation.
Although defendant has attempted to present its affirmative defense under two headings, the first fails for the reasons stated. The only legitimate claim defendant raises is its second one  that plaintiffs conspired to set unreasonable runs and clearances, to its detriment. We proceed to a consideration of that basic issue.

*235 IV.
It will be recalled that defendant claims the Sherman Act has been violated in that the so-called uniform clearance and run provisions inserted in the various license agreements it had with the several plaintiffs were determined and imposed upon it as a result of a conspiracy and agreement to which all the plaintiffs were parties. The allegations of its affirmative defense so summarized were taken almost verbatim from the findings of fact and conclusions of law by the statutory court in the Paramount Pictures case, where the court held that it was a violation of the Sherman Act when distributors acted in concert in the formation of a uniform system of clearances for the theatres to which they licensed their films. 66 F. Supp., at page 343, and see the case on appeal, 334 U.S., at pages 146, 147, 68 S.Ct. at pages 923, 924.
Defendant concedes that
"* * * if the contract sued upon was collateral to the illegal conspiracy, the violation of the Sherman Act is not available as a defense to an action on that contract, but that if the contract upon which the pending action is based is inherently a part of the conspiracy, or to put it conversely, the illegality is inherent in the contract itself, then a violation of the Sherman Act is available as a defense to an action on the said contract."
It also concedes that the distinction between what is "inherent" and what is "collateral" illegality in this connection depends upon an analytical comparison of the two leading decisions in point, both written by the late Mr. Justice Harlan: Connolly v. Union Sewer Pipe Co., 184 U.S. 540, 22 S.Ct. 431, 46 L.Ed. 679 (1902), dealing with collateral illegality, and Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 29 S.Ct. 280, 53 L.Ed. 486 (1909), dealing with inherent illegality. The trial court, after a consideration of these cases and the citation of others in support of its conclusion, held that defendant's affirmative defense was legally insufficient because the claimed illegality was collateral to the contracts in suit, *236 under the Connolly rule. On appeal defendant argues, as it did below, that the defense should be sustained because the illegality claimed was inherent to the contracts, under the Continental Wall Paper case.
We note, parenthetically, that neither party to this appeal has considered whether state or federal law is determinative of the question before us, namely, under what conditions does a breach of a federal statute, which breach influenced the amounts allegedly due under state law, constitute a defense to the state law claim for the balance of license fees due? Both parties assume that federal law governs. We consider that the question of whether a violation of the federal anti-trust laws may constitute a defense to a state cause of action in contract is a federal question. Cf. Bruce's Juices v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219 (1947). The determination of under what conditions the violation constitutes a defense would also be a federal question, since otherwise the additional remedy under the federal statute might be distorted beyond what the interpreting authority (i.e., the United States Supreme Court) deemed that Congress intended. The cases seem so to hold, although the issue has never been discussed. We turn to a consideration of the Connolly and Continental Wall Paper cases.
Plaintiff in Connolly sued upon notes which defendant had given it in purchase of a quantity of sewer pipe. Defendant pleaded, among other things, that plaintiff, by agreement of various persons, firms and corporations engaged in the sewer pipe trade, had been incorporated to act, and did act, as their agency in effectuating an illegal trust, combination or conspiracy to monopolize the sewer pipe trade and fix prices at which pipe could be sold. Further, that plaintiff's sales to defendant were made at prices so unlawfully fixed, and were therefore illegal and void under the Sherman Act. The court held the defense invalid, stating:
"* * * plaintiff, even if part of a combination illegal at common law, was not for that reason forbidden to sell property it acquired or held for sale. The purchases by the defendants had no *237 necessary or direct connection with the alleged illegal combination; for the contracts between the defendants and the plaintiff could have been proven without any reference to the arrangement whereby the latter became an illegal combination * * * The contracts between the plaintiff and the respective defendants were, in every sense, collateral to the alleged agreement between the plaintiff and other corporations, firms or associations whereby an illegal combination was formed for the sale of sewer pipe." (184 U.S., at page 549, 22 S.Ct. at page 435)
In Continental Wall Paper plaintiff sued for a balance due on account of wallpaper sold and delivered to defendant jobber. As in Connolly, defendant pleaded that plaintiff had been organized and incorporated by various wallpaper manufacturers as a common selling agency, in order to restrain trade and fix wallpaper prices at all levels of distribution. Defendant further alleged that plaintiff, in pursuance of the objects of the conspiracy, compelled defendant to become a party to the conspiracy by entering into a written agreement to buy all of its wallpaper requirements exclusively from plaintiff, at prices illegally fixed by the conspiracy, and compelled defendant to agree illegally to maintain the seller's list prices and not to resell the wallpaper so purchased at prices lower than a fixed schedule of minimum prices. Defendant claimed that plaintiff should be denied recovery of the unpaid purchase price because the purchase orders were inherently unlawful in that they were made in furtherance of the illegal price-fixing scheme to which it had been made a party. The court sustained defendant's contention by a narrow majority, Justices Holmes, Brewer, White and Peckham dissenting.
Speaking for the majority in Continental Wall Paper, Mr. Justice Harlan pointed out that
"The present case is plainly distinguishable from Connolly Case. In that case the defendant, who sought to avoid payment for the goods purchased by him under contract, had no connection with the general business or operations of the alleged illegal corporation that sold the goods. * * * His contract was to take certain goods at an agreed price, nothing more, and was not in itself illegal, nor part of nor in execution of any general plan or scheme that the law condemned. * * *" (212 U.S., at page 260, 29 S.Ct. at page 291; italics the court's)
*238 He went on to say:
"The case now before us is an entirely different one. The Continental Wall Paper Company seeks, in legal effect, the aid of the court to enforce a contract for the sale and purchase of goods which, it is admitted by the demurrer was in fact and was intended by the parties to be based upon agreements that were and are essential parts of an illegal scheme. * * *
The present suit is * * * based upon * * * agreements, to which both the plaintiff and the defendant were parties, and pursuant to which the accounts sued on were made out, and which had for their object, and which it is admitted had directly the effect, to accomplish the illegal ends for which the Continental Wall Paper Company was organized. If judgment be given for the plaintiff the result, beyond all question, will be to give the aid of the court in making effective the illegal agreements that constituted the forbidden combination. These considerations make it evident that the present case is different from the Connolly Case. * * *" (212 U.S., at page 261, 29 S.Ct. at page 291; italics the court's)
The fact that defendant received a windfall was held not material  it is the public welfare that is uppermost  and following the long established rule the court refused to give its aid in any measure whatsoever to a party seeking to realize the fruits of an agreement tainted with illegality.
The parties on this appeal propose various rationales for distinguishing Connolly and Continental Wall Paper. Plaintiffs contend that the cases turn on whether defendant was a participant, however unwillingly, in the conspiracy pursuant to which the contracts in suit were made (as in Continental Wall Paper), or not (as in Connolly). Pursuing this ground of distinction, plaintiffs logically argue that for a purchaser simply to agree to buy what the seller has every right to sell, but at prices illegally fixed by a sellers' conspiracy, as in Connolly, is not to become an active party to the wrong, even though such a contract may serve the unilateral purpose of the seller to carry out the objects and purposes of the conspiracy. Connolly squarely held such an agreement not to be inherently illegal. On the other hand, a would-be purchaser's agreement, made as part of the consideration for all future sales, not to resell the purchased goods at less than the prices fixed by a conspiracy, and thus to make himself a party to the illegal conspiracy *239 to maintain resale prices, and himself to agree to further the wrongful objects and purposes of that price-fixing conspiracy, as in the Continental Wall Paper case, is a direct participation by the purchaser in such wrongful objects and purposes, and makes all purchase contracts entered in any pursuance of such an unlawful arrangement inherently illegal. The courts deny enforcement to such purchase agreements on public policy grounds, and accordingly leave the parties where they find them. Volk v. Paramount Pictures, 91 F. Supp. 902, 905-906 (D.C. Minn. 1950).
The United States Supreme Court has, in later cases, apparently recognized this as the true ground of distinction between the two cases. See, e.g., Bruce's Juices v. American Can Co., above, 330 U.S., at page 755, 67 S.Ct. at page 1020. Cf. Bell v. Lamborn, 2 F.2d 205 (4 Cir. 1924); Turner Glass Corp. v. Hartford Empire Co., 173 F.2d 49, 52-53 (7 Cir. 1949).
Defendant resists this basis for distinguishing the Connolly and Continental Wall Paper cases, claiming that it would be "an anomalous situation if the courts were to grant relief to a party who was both a participant in and the victim of an illegal conspiracy and in another situation were to deny relief to a party who was a non-participant in but a victim of an illegal conspiracy because of such non-participation." This ignores two considerations. The first is that the defense of illegality is not allowed as a "relief" to a defendant. This was pointed out in McMullen v. Hoffman, 174 U.S. 639, 669, 19 S.Ct. 839, 43 L.Ed. 1117 (1899):
"The court refuses to enforce such a contract, and it permits defendant to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest. It has been often stated in similar cases that the defense is a very dishonest one, and it lies ill in the mouth of the defendant to allege it, and it is only allowed for public considerations and in order the better to secure the public against dishonest transactions. * * *"
And see the Continental Wall Paper case, above, 212 U.S., at pages 262-263, 29 S.Ct. at page 292, where McMullen *240 is quoted with approval. In short, whether defendant is the victim of a wrong is of no moment in granting or denying the defense; indeed, the defense is not allowed out of any sympathy for either party's position.
Another answer to defendant's claim of "anomoly" is that the Sherman Act provides relief for the alleged wrong it has pleaded by way of affirmative defense. Defendant may sue for treble damages in the federal jurisdiction. 15 U.S.C.A. §§ 15 and 26.
Plaintiffs also suggest that the two leading cases may be distinguished on the basis of whether illegality appears on the face of the contract. Although that rationale has some support in the cases, see Gasoline Products Co. v. Champlin Refining Co., 46 F.2d 511 (D.C.S.D. Me. 1931), and would minimize excursions into side issues, it would appear to be somewhat unrealistic. Such a criterion might well make the issue of enforceability depend upon the artfulness of the draftsman of the contract, or upon whether the illegality was apparent or disguised. It would invite conceptualistic distinctions as to whether illegality did or did not appear on the face of the document, and how much (if any) interpolation could be made in the writing.
Defendant offers its own rationale for distinguishing between the two cases, namely, that the alleged conspiracy in Connolly had no impact upon the contracts there involved. The distinction disregards the facts in both cases. The impact of the conspiracy on the contracts in suit was just as direct in Connolly as in Continental Wall Paper  disregarding for the moment defendant's direct participation in the illegal conduct complained of in the latter case by his agreement to maintain resale prices to his customers at levels fixed by the conspiracy.
We find that defendant's contention that the instant case be regarded as within the rule of Continental Wall Paper because the clearance provisions of the contracts substantially affected the schedule of license fees, proves too much. In Connolly the defense was that the prices imposed upon defendant, although lawful on their face, were unlawful *241 because they were the result of concerted action. Certainly in that case the unlawfully fixed prices were as vital a part of the contract as are the unlawfully fixed clearances here. The cases are not materially different in this respect. And the argument that the unlawfully fixed clearances influenced the license fees can only mean that Connolly, where the unlawfully fixed prices not only influenced the contracts in suit but were the actual provisions sued upon, was wrongly decided.
Although there is merit in, as well as support for, plaintiffs' contention that Connolly and Continental Wall Paper turn on whether or not defendant was a participant in the conspiracy, the basis for distinguishing the two cases might better be stated in this way: that in the latter the contract sued upon called for some further unlawful act. The contract in Continental Wall Paper required defendant to charge fixed resale prices. This, of course, was illegal. In Connolly no such restriction appears; once the defendant had the sewer pipe he could do with it as he wished. This distinction is meaningful when related to the theory of the court in Continental Wall Paper  that the court would not further an illegal scheme by granting a judgment that validated a contract requiring some further activity.
We cannot say, as defendant would have us hold, that a judgment for plaintiffs in the instant case would further an illegal scheme, unless we expand this concept beyond the meaning of Continental Wall Paper to include the scheme in Connolly. That is, to support the proposition just stated we would have to say that any judgment in favor of one who is a party to a conspiracy to restrain trade, in a suit on a contract whose terms partly resulted from his unlawfully dominant position, "furthers the illegal scheme." This the Connolly court refused to do, as did the court in all the cases set out in the opinion of the court below and in the briefs. We find no case cited to us which supports the broad proposition for which defendant contends, and none is so similar to this case as to compel a particular result.
*242 We hold, as in Connolly, that the alleged illegality pleaded by defendant was collateral to the contracts in suit. Although we decide this matter as a question of applicable federal law, we find three New Jersey cases which, although not precisely in point, tend to support the conclusion that the illegality here alleged does not render the contracts unenforceable. See Trenton Potteries Co. v. Oliphant, 58 N.J. Eq. 507, 520-525 (E. & A. 1899); Voices, Inc. v. Metal Tone Mfg. Co., above, 119 N.J. Eq., at pages 335-337; cf. Brennan v. United Hatters, 73 N.J.L. 729, 739 (E. & A. 1906). There is no reason why, even if state law were to govern, the distinction between Connolly and Continental Wall Paper, as discussed above, should not be held applicable.
Affirmed.