## ZENITH RADIO CORP. v. RADIO CORP. OF AMERICA et al.

### Civ. A. No. 1098.

United States District Court
D. Delaware.
June 13, 1952.

Arthur G. Connolly, Wilmington, Del., Willis H. Taylor, Jr., and R. Morton Adams, of Pennie, Edmonds, Morton, Barrows & Taylor, New York City, Burton K. Wheeler and George F. Hirmon, Washington, D. C., Irving Herriott and Francis W. Crotty, Chicago, Ill., Thomas Reddy, Washington, D. C., for plaintiff.

Caleb S. Layton, of Richards, Layton & Finger, Wilmington, Del., Stephen H. Philbin, of Fish, Richardson & Neave, John T. Cahill and John W. Nields, of Cahill, Gordon, Zachry and Reindel, William H. Davis and Brian Forrow, New York City, for defendant Radio Corp. of America.

William Prickett, Wilmington, Del., John E. F. Wood and Henry R. Ashton, of Fish, Richardson & Neave, New York City, for defendant Western Electric Co., Inc.

John J. Morris, Jr., of Hering, Morris, James & Hitchens, Wilmington, Del., Albert C. Bickford and Thomas Thacher, of Simpson, Thacher & Bartlett, New York City, for defendant General Electric Co.

LEAHY, Chief Judge.

This is an action for judgment that defendants' pooled patents be declared unenforceable against plaintiff. Defendants counterclaimed charging infringement on specific patents. In 1946 plaintiff was a licensee under defendants' patents. Plaintiff brought its first declaratory judgment suit and this particular action came at issue. Then, after the license had expired plaintiff brought its second and the present suit. A statement is made that a motion will come later to consolidate.[1] The second complaint, substantially similar to the first, recites that the license has ended.

The action here is by Zenith Radio Corporation against Radio Corporation of America, Western Electric Company, Incorporated, and General Electric Company.[2] Zenith filed its complaints seeking a declaratory judgment of non-infringement, invalidity, and unenforceability of defendants' patents. Defendants—RCA, WE and GE—counterclaimed on infringement of 40 specific patents.[3] Although some of the patents involved are concerned with television receivers using cathode ray tubes, RCA brought another action in Chicago in 1948 alleging infringement because of manufacture and sale of cathode ray tubes for television receivers. The action was brought against Zenith, plaintiff here, and its subsidiary, Rauland Corporation. To that action plaintiff here plead invalidity and non-infringement, and it also raised the same issue of unenforceability because of misuse.

The complaint alleges pooling of thousands of patents and a blanket assertion against Zenith for infringement. The vital allegation, for present purposes, is that none of the pooled patents "can be validly asserted against plaintiff as infringed by plaintiff's radio apparatus." The justiciable controversy asserted is broad and without limitation. Plaintiff wants to know whether the manufacture and sale by it of its radio apparatus constitutes infringement of any valid patent rights owned by defendants; and whether any of defendants may in any way use their patents to interfere with the continuance of plaintiff's business.

1. Plaintiff's reason for filing the case at bar was the lurking defect in the first action, i. e., as licensee, plaintiff may have been estopped to challenge validity and hence there would have been no justiciable controversy between the parties.

2. In the matter at bar, defendants American Telephone and Telegraph Company, Bell Telephone Laboratories, Inc. and Westinghouse Electric Corporation are outside the jurisdiction of this court.

3. 24 patents are specified by RCA; 10 by WE; and 6 by GE.

564

As stated, defendants RCA, GE and WE filed answers and counterclaims.[4] The existence of a justiciable controversy is admitted with respect to the 40 identified patents. Plaintiff's reply denies infringement, charges invalidity, and claims the specified patents are unenforceable for the reasons stated; in fact, it is charged *all* of defendants' patents were acquired "as part of a plan and conspiracy to dominate and monopolize in violation of the antitrust laws". As a result, says plaintiff, by virtue of unlawful monopoly and practices, defendants are abusing the privileges of the patent system and therefore they should be barred from enforcement of their patents.

Much pretrial discovery has occurred as well as many pretrial conferences. Defendants utilized interrogatories in order to require plaintiff to particularize the allegations of invalidity. Answers to these have been made. Plaintiff has asked for the right to inspect certain writings relating to the origin and history of the inventions. I allowed this inspection by order of May 7, 1951. Defendants have stated that it will take many more months before they will be able to collect the remainder of these particular documents. It is planned depositions will follow the disposition of the questions raised by the interrogatories. The latest group of interrogatories, the ones which become pertinent for discussion at this time, will be described later.

One of the major problems for decision is the parties are apart on the frame of reference—plaintiff seeks to go back to 1919 at the time of the formation of RCA in order to show an original conspiracy, among the defendants, to illegally pool patents and to show, also, divisions of territories as well as divisions of use.

The present matter originally arose by a blanket objection on the part of defendants to plaintiff's interrogatories. These interrogatories are voluminous. They run to 166 printed pages, comprising 419 numbered interrogatories; and, by looking at the independent paragraphs, it may be said that some 1,185 separate queries have been

put. For example, RCA claims that interrogatory 356 asked for a total of more than one million items respecting defendants' patents, many of which have expired and have nothing to do with the patents in suit. In short, the interrogatories seek, in detail, the business, management and affairs of more than 20 corporations over a period of 30 years. After a pretrial discussion on the problems surrounding the questions raised by the interrogatories, defendants filed a motion under Fed. Rules Civ.Proc. rule 42(b), 28 U.S.C. and asked for an order granting a separate trial of the issues of validity and infringement of the patents specified in the counterclaim.

A pretrial conference was noted, at which time an attempt—it was hoped—would be made to limit the issues. Plaintiff's position is that defendants' motion is premature for the reason that a pretrial conference directed to a determination of the issues to be tried should not be had until all discovery is completed. Plaintiff objects to the attempt on the part of defendants to limit the issues to the apparatus alleged to infringe in the counterclaim.

One of the questions which must be met is whether defendants, having been brought into court, can say they charge plaintiff with an infringement of 40 patents, and whether that is the issue raised by the declaratory judgment suit; or whether plaintiff can say it has the right during pretrial discovery procedures to go back 30 years in order to demonstrate misuse or violation of the antitrust laws in order to establish defendants' inability to charge infringement, not only as to the 40 patents mentioned, but also as to some 10,000 patents which are owned by all defendants.

█ The nature of plaintiff's proposed interrogatories may be found by succinct exposition. Interrogatories 1 through 196, for example, are concerned with ancient agreements entered into before 1923. Interrogatories 197 through 308 cover the period from 1925 to the consent decree of 1932 (which will be explained later). Interrogatories 309 through 354 deal with

4. As noted, the other defendants, A T & T, BL and Westinghouse, have not accepted the invitation to appear in these proceedings.

other consent decrees and certain activities pursuant to those decrees through 1935. All the interrogatories are, in the main, concerned with radio broadcasting, and international radio telegraph traffic. In this connection, interrogatories 341–43 call for all contracts and documents relating to the negotiation of all contracts and the identification of all personnel engaged in the negotiation of such contracts with respect to the transmission of wireless messages by RCA between the United States and Poland, Argentina, Chile, Brazil, Belgium, China, Czechoslovakia, The Dutch West Indies, The States of the Levant Under French Mandate, Italy, Indo-China, Japan, Liberia, The Netherlands, The Dutch East Indies, Portugal, Surinam, Siam, Spain, Sweden, Costa Rica, Turkey, Russia,Venezuela, Australia, Germany, France, Bo-livia, Canada, Cuba, Switzerland, Territory of Hawaii, The Fiji Islands and Tahiti. With respect to interrogatories 355 through 419, they are addressed to patents but they make no mention of the patents in suit; instead they relate to all patents ever owned or licensed by RCA. I have no intention of going through all of the 419 interrogatories[5] with their 1,185 subdivisions and discussing them in detail.[6] The 166 pages of interrogatories, while put, I believe, in good faith by plaintiff's counsel, nevertheless, I have concluded, to permit them to be used would be to expand this case by a length and breadth of oppressive detail which the courts, if not in the past, should refuse to countenance.[7]

I shall refer to substantial portions of the record taken at the pretrial conferences. The matter to be determined is of much

5. Post-argument, plaintiff urged the application of Caldwell-Clements, Inc. v. McGraw-Hill Publishing Co., Inc., S.D.N.Y., 12 F.R.D. 531. That authority has been studied at length, but I shall not pause to distinguish it, on its facts, from the matter at bar.

6. F.R. 33 does not sanction oppression by interrogatories. Many courts have struck interrogatories less burdensome than these here present. E. g., Hercules Powder Co. v. Rohm & Haas Co., D.C.Del., 3 F.R.D. 328; Porter v. Montaldo's, D.C., 71 F.Supp. 372; Aktiebolaget Vargos v. Clark, D.C., 8 F.R.D. 635; Tivoli Realty, Inc. v. Paramount Pictures, Inc., D.C.Del., 10 F.R.D. 201; Dipson Theatres, Inc. v. Buffalo Theatres, Inc., D.C., 8 F.R.D. 86; Cinema Amusements, Inc. v. Loew's Inc., D.C. Del., 7 F.R.D. 318; Walling v. Parry, D. C., 6 F.R.D. 554; Jones v. Pennsylvania Railroad Co., D.C., 7 F.R.D. 662.

In addition, there is authority that interrogatories will be stricken if they are excessive in number. Wright v. R. & L. Market, D.C., 9 F.R.D. 559 (31 too many). Compare also the following cases decided before the effective date of the 1946 amendment to F.R. 33; Batemore, Inc., v. Standard Brands, Inc., D.C., 7 F.R.D. 455 (65 too many); Checker Cab Mfg. Corp. v. Checker Taxi Co., D. C., 2 F.R.D. 547 (79 too many); Brightwater Paper Co. v. Monadnock Paper Mills, D.C., 2 F.R.D. 547 (55 too many); Stewart-Warner Corporation v. Staley, D.C., 2 F.R.D. 199 (33 too many); New

England Terminal Co. v. Graver Tank & Mfg. Corporation, D.C., 1 F.R.D. 411 (68 too many).

Again, in the absence of a strong showing of relevance a party will not be required to disclose confidential information.

Interrogatory 414 requires a complete breakdown of RCA's volume of business in dollars, net profits and royalties according to various areas of activity. This information is confidential and is not relevant at all. The interrogatory is clearly improper. Wagner Manufacturing Co. v. Cutler-Hammer, Inc., D.C., 10 F.R.D. 348; Canister Co. v. National Can Corporation, D.C.Del., 8 F.R.D. 408; Cities Service Oil Co. v. Celanese Corporation of America, D.C.Del., 10 F.R.D. 458; Hirshhorn v. Mine Safety Appliances Co., D.C., 8 F.R.D. 11; and cases there cited.

7. In the Report of the Committee of the Judicial Conference of the United States in the matter of Procedure in Antitrust Cases (p. 12), the boundaries of proper discovery in an action such as this should be established by the issues as specified at pretrial conferences. So narrowed, these issues fix the subject matter for decision. And only such matters relevant to that subject matter are valid discovery under F.R. 26–33.

GE points out that while plaintiff contends other patents and apparatus are in the case at bar, plaintiff has, in fact, commenced in this court two other actions (our C.A. 982* and 1247) seeking

vital interest to the parties, for the decision which is made now will direct the course of this large and complex litigation. Many difficult and troublesome questions arose at pretrial. For example, I attempted to have counsel give me the legal distinction between the "misuse of a patent monopoly" and a "use" which was in violation of the antitrust laws. The following occurred:

"Mr. Adams: Assuming we prove that they have just taken this blanket of patents and said to Zenith, 'We have a blanket of patents and we are going to get you. You are the only one in the industry who refuses to take our license. You are the only one that refuses to pay us a tax for the privilege of doing business.' That is what we say they say.

"Now, I would expect, if we are right about it, your Honor would also find that that mass of patents which they used as a mass was part of a scheme, was created as part of a scheme to violate the antitrust laws. Therefore your Honor would hold that they cannot enforce any of them against us and your Honor would hold that you therefore do not need to go into the questions of validity or infringement of any of them.

"The Court: It is your thesis, then, that this is what I have sometimes referred to as an *in terrorem* approach on the part of RCA?

"Mr. Adams: It certainly is, your Honor, and we think they have done exactly that, and that is what we allege in our compaint, and that is what we offer to prove, and we have asked these interrogatories in order to get the evidence.

"Now, your Honor will understand if we are right about that there is no occasion to even discuss the other side's proposition that it should be limited to particular

patents. It is just off the beam. Naturally enough, sure, I can understand it. They would love to limit it to particular patents, just as they would like to get rid of the charge of antitrust violation; and they keep using the term 'misuse' as though a violation of the antitrust laws by means of patents was not a misuse of patents.

"The Court: You heard the question Mr. Nields along that line this morning and I would like your version. I would like your help because I don't get the distinction as yet between misuse as distinguished from a violation of the antitrust laws.

"Mr. Adams: I don't either, your Honor, in a sense, but what has happened is this, and I think it goes back to the very earliest of the cases, the motion picture patents case. [Motion Picture Patents Co. v. Universal Film Mfg. Co., 243 U.S. 502, 37 S. Ct. 416, 61 L.Ed. 871.] This is my own explanation of how it comes into the law.

"Whoever argued that case was confronted by the fact that the Supreme Court of the United States had 5 to 4 established a contrary doctrine in the A. B. Dick case [Henry v. A. B. Dick Co., 224 U.S. 1, 32 S.Ct. 364, 56 L.Ed. 645], namely, that a patent owner could restrict the use of his patented machine to unpatented articles supplied by and used therewith. So it was urged in the motion picture patents case that whatever the law was in the Dick case it was changed by the Clayton Act [15 U.S.C.A. § 12 et seq.], so that it now became or his conduct became illegal as a violation of the Clayton Act. What the Court said was we don't have to go into the question of whether it is a violation of the Clayton Act. We find you can't do that with a patent.

"Now, as recently as the Morton Salt case [Morton Salt Co. v. G. S. Suppiger, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363]

similar declaratory relief against other patents of defendants with respect to other specific home receiver apparatus which in those actions plaintiff here alleges it is making.

The Report of the Judges' Committee to the Judicial Conference shows the concern of the judiciary with the Gargantuan proportions of present-day trials and the caveat against much of the man-

ner and techniques which have been utilized in cases decided in the past. For example, so far in my trial of the antitrust case of U. S. v. E. I. duPont de Nemours & Co., which is still active (trial started January 17, 1951 and still in process), I have, in the course of the trial, been required to write six trial opinions.

*See 78 F.Supp. 591.

the Supreme Court again had occasion to say the same thing, because in the Morton Salt case the case went to the Supreme Court as a result of a motion for summary judgment and the defendant or rather the party who owned the patent in that case urged that no summary judgment should be granted because it ought to be given an opportunity to put in evidence to show that what it was accused of doing was not a substantial restraint of competition and hence could not be a violation of the antitrust laws. The Supreme Court, however, disposed of that and said we don't need to go so far as to say it is a violation of the antitrust laws; all we have to do is to say you can't use a patent this way.

"Now, the Courts have also said, of course, that if you do go so far as to violate the antitrust laws of course there is a misuse of patents, but they have recognized that there may be acts which do not fall within the four corners of the antitrust laws which are nonetheless contrary to public policy. I think the Supreme Court has repeatedly stated that in its opinions, that it is contrary to the purpose of the patent system and it is contrary to public policy to try to use a patent so as to create a monopoly which the Patent Office never intended to give, and they have said that that public policy was so great that even the doctrine of *res adjudicata* must yield to it. So that doctrine of misuse crept in in order to establish that there may be cases which are short of a violation of the antitrust laws. I think that is why our opponents here would like to talk about it. They use it as a means of trying to limit it to something other than the violation of the antitrust laws, and yet we think and we allege that they have misused by violating the antitrust laws, as well as otherwise.

"Now, have I—

"The Court: You have very clearly explained it to me, yes.

"Mr. Adams: Now, as far as the interrogatories themselves are concerned, I think perhaps the best way to approach them as throwing light on this particular issue is for me to very briefly state what we think of as the violation of the antitrust laws and the conspiracy which we are attempting to prove. I think with that in mind the interrogatories are almost self-explanatory. When we drew them up we tried to divide them into sections. We tried to give them titles. We tried to make the things flow in a very orderly way so as to fit into what we thought of as the simplest method of approaching this antitrust violation.

"Now, the story briefly, your Honor, is this: During World War I, I think it became evident to a great many people in this country that there were two dominant radio companies in the world, particularly in this country. One of them is the British and the other was the German. The Alien Property Custodian seized the German interests, not only seized them, but sold them to the Navy, I may say for an oddly small amount. That left only the British and they were in the dominant radio position. Well, under those circumstances, it occurred to the General Electric Company that radio is destined to be a great industry. Now, they then organized the Radio Corporation of America to be the dominant radio company, but under their control.

"The Court: Who are 'they'?

"Mr. Adams: The General Electric Company. Now, at that time we think that the complete plan was established and that it was a question of separate months or maybe separate years to bring it into fruition. But in any event one of the first steps was to organize RCA. I think even before that the groundwork was laid and that GE had made arrangements with the British interests to buy out their U. S. dominating position.

"In any event, as soon as GE had caused RCA to be organized it also caused RCA to buy out the British interests.

"Then what happened was that they made arrangements for domination of the world radio.

"Now, the reason that becomes important to us is two-fold. In their deals whereby they divided territory with the British and with the Germans and with the French, and later with the Dutch, in their deals whereby they divided up the entire South American territory, there were two characteristics: one of them was that this il-

legal division of territory and trade was cast in the guise of patent licenses. The other was that they contained provisions for a self-perpetuating funneling into a pool of patents, and mind you none of these patents was disclosed in the documents and arrangements, none of the cross license agreements and none of the funneling provisions ever had to talk about particular patents, because the scheme was set up on the basis 'You have a mass of patents, we have a mass of patents, and if a third party hasn't got a mass of patents he better go get him some and then he can get into the deal, and we will justify it all on the basis of patent licenses.'

"We say that that has permeated this scheme from the outset and continues to permeate it today.

"Gradually, I think within a very few months, A T & T was brought into it. And mind you also that in these agreements what they did is they would allocate a certain field to GE, they would allocate a certain field to A T & T, and they would allocate a certain field to RCA. Later when Westinghouse came in it got part of the field.

"The Court: What do you mean by a field?

"Mr. Adams: Well, for example, they would say to the A T & T, 'You can have telephone communication.' GE said, 'We want electronic purposes other than radio communication, but we want to be the one that makes all the apparatus for RCA.' So when Westinghouse came in they shared their so-called nonradio eletronic field with Westinghouse and they also shared the making of the radio apparatus for RCA. RCA presumably was given the field of radio communication, but then they had a little trouble distinguishing that from the telephone company field and so they limited it to telegraph instead of telephone. But it was that kind of a division, not of territory—the territorial division was international—but what we call the field of use territory was within the United States among companies who thereby were prevented from competing. We say that some of their own operations which have been —true, by hearsay disclosed to us—reveal that they got into squabbles among themselves as to who got what, and they had arbitration proceedings even to fight it out, and some of the statements made in the arbitration proceedings we think are quite revealing. We think a good many of the items that we have asked for here will be revealing as to the true intent to perpetuate a vast scheme of monopoly by means of patents and by means of undisclosed patents, and that part of the scheme is to set up organizations where they could take the income from the royalties which they eventually collected from the industry to create research laboratories to create still more patents, and this, mind you, goes on forever.

"The agreements that are in existence today appear to have a termination date, but as I read them they end only if somebody wants to exercise the termination date, and a notice has to be given some three years in advance, and furthermore even under the agreements they continue to apply as long as any patent exists for which the application is now in the Patent Office.

"The Court: Didn't the Department of Justice catch all that business in its 1932 decree?

"Mr. Adams: It certainly did not, your Honor, none of it.

"The Court: Why not?

"Mr. Adams: In the first place, because we say the only charge that was made— and let me recite them briefly—one, I think the parties who owned the stock in RCA divested themselves of that kind of control of RCA, and I don't know that that continues any longer. We assume it doesn't. Another thing that happened was that they said they would give up their exclusive rights. Now, that was for the United States and also for abroad, and I think that is the thing that the other side would point to as being the great change.

"Now, a third thing that happened was that each party recaptured enough of what had previously been granted so that it could operate under its own patents in these fields which had previously been given exclusively to the other fellow.

"Now, you would think that on the surface that that would work out to clean up the monopoly and to destroy the scheme.

"The Court: Is it your contention they outsmarted the Department of Justice?

"Mr. Adams: Yes, your Honor, and we think the Department of Justice came into this Court later and said so and wanted to reopen the decree.

"The Court: That was a matter before Judge Maris, wasn't it?

"Mr. Adams: Yes, your Honor, and I think the holding in that case was that the Department of 'Justice stood in the same position as a private litigant, that having made and signed a decree it could not change it later. But I point to the fact that the Department of Justice itself came in and wanted to reopen it as evidence that it found out that it had been outsmarted.

"The Court: I am sorry I used that word. I don't like to use it.

"Mr. Adams: Well, I shouldn't have myself.

"Well, we think there is a great deal going to be revealed in the answer to these interrogatories as to what happened in that Department of Justice arrangement. We have asked very pointed and specific questions so we will find out what happened. What the other side is asking your Honor to do is before anybody knows the facts to say we cannot prove that case. That is all they are asking. They want to knock that issue out of the case before they have to state any facts.

"Now, just to look at the interrogatories, the first set concerns the organization of RCA by GE. It seems obvious from what I have stated that that is the conspiracy, that is the origin of it. We want to know— in fact, we ask a very pointed question: Why did GE organize RCA?

"Then in the next set we ask inquiries concerning the acquisition of the Marconi interests by RCA. Then we ask about how did RCA happen to combine with GE and what was the deal between them. Then we ask about these combinations with the British and the French and the German companies.

"Let me add to what I said a moment ago about the significance of that to Zenith. RCA put itself in the position with these foreign deals so that it could not grant Zenith the right to export its apparatus. It could not give any license to Zenith with respect to operations in foreign countries; and, furthermore, put the world in the condition so that when Zenith exports its apparatus it butts right into another pool in the foreign countries, a pool of patents of exactly the same type as the pool we are talking about here.

"Now, these things are directly relevant to the charge that we make and to the position in which we find ourselves where they are asserting this blanket and trying to, as I say, levy a tax on us for the privilege of doing business.

"Now, I could go through the interrogatories. We come to the South American consortium. I have already referred to that. That was a flagrant manifestation, we think. Let me say this also—

"The Court: I have listened to that word for nearly a year now.

"Mr. Adams: Well, maybe I should use a more modern term, but the fact, we think, is the same, and that is that in these deals in the answers to the questions that we have asked will be found proof of their intention, their purpose, and the scheme by which they intended to carry it out and to perpetuate it.

"The Court: Mr. Adams, have I got your thesis correctly? You walk into the courtroom when you start your trial and don't go into any technical discussions of the patents at all; is that correct?

"Mr. Adams: None, none. I can imagine that we might pick out some particular phony patent of theirs just to show that it was phony. For example, Mr. Nields says why do we ask for them to tell us about the cases where they have two patents with the same claims. We think they have that information or they documented. We think that is the kind of organizations they are where they keep information like that available. If they don't know, just let them say they don't know. He talks about these

million items. You know what he did with that one?

"The Court: That frightens me.

"Mr. Adams: Surely, me, too; but it is not true.

"The Court: Why isn't it?

"Mr. Adams: Number one, it is the kind of information that they have already tabulated. That is the way they do their business. Again, if they don't have it, if they have a blanket of 10,000 patents and don't know what they are, just let them say so, if that is what they are asserting. But it is not that kind of a thing.

"Now, to build up the figures what he does is to slip in the word repetitious. He multiplies them all by 30, because we ask for that information each year, and I suppose it has not occurred to him that he could say in one year 'Ditto for the year 1950 so and so', having given it all for the previous years.

"Now let me say a word about this order of trial. I am conscious of the fact that we would like to dispose of the case as soon as we can, and Mr. Nields has said to your Honor they would like to have the patent issues tried first and promptly. We think that the antitrust issue is the only issue that can dispose of the case. We think, as we stated to your Honor before, that even if we meet them on their patents as they have asserted in their counterclaim, and if we prove every one of them invalid and every one of them not infringed, we still have not secured the protection we started out to get, and we still have to go through the litigation on that issue. We say that being so, let us do it first.

"The Court: Well, why wouldn't you be satisfied to win your own private war? Why do you want to destroy the whole empire the defendants have created?

"Mr. Adams: That seems to us to be the only way we could get the protection, your Honor. You see, they have this mill going. The patents are popping up all the time, every week.

"The Court: In other words, you may be sued in 1953 or 1954?

"Mr. Adams: Surely, or tomorrow.

"Specifically—maybe this is completely a digression—but on the patent end of it I would say that they have not—and this is something for independent argument—they have not complied with the order of this Court to produce the information and documents that we ask for under Rule 34, and I am sure we are going to have to take depositions in order to compel them to do it, just as we are taking depositions on similar matters in the Chicago case, where we had to even go to the Court to get them to identify documents that they were withholding. We had to bring a motion to get the judge to order them to identify them, and yet they will say they want to try the case. Of course they want to try it before they give us the facts. But, as I say, that is a separate matter.

"As far as the interrogatories are concerned, we put in a lot of time trying to make them pertinent, clear, to bring out the evidence which we think we have to have in order to prove our case. I completely sympathize with the point of view of the Courts that when it comes to the trial of the case they don't want to be burdened with masses of evidence. We as lawyers don't want to be burdened with it, but the time to face what goes into evidence at the trial I think comes at the time when the discovery is completed. Certainly we as competent counsel are going to be able to eliminate the irrelevant material. Certainly that is our intention. But we can't unless we have it.

"Mr. Wheeler: First I want to be sure that it is clear in the mind of the Court what happened with reference to these agreements originally, because that is extremely important in order to understand the fundamental principles of why and how they set up this monopoly.

"The Court: What year are you starting with?

"Mr. Wheeler: 1919. On October 17, 1919, they organized RCA. On October 17 of 1919 the agreement was made with the American Marconi, and on November 21 RCA and the British Marconi entered into an agreement whereby RCA granted an exclusive license to all of the patents that

she had, and British Marconi granted a license to RCA to all the patents that they had. Thereby they excluded RCA from manufacturing or selling in England, because if RCA did attempt to do it they would be not only violating—they would not only be violating the British patent, but they would also be violating their own patents, and the same thing would occur with the British Marconi. They could not come to the United States and manufacture or sell, manufacture with just their own patents. They completely excluded and divided up the territory in that way.

"Now, then, the same thing happened, the identical same thing happened with the French agreement. When they talk about what relation has the communications agreements with the manufacture of radio sets, I call your attention to the fact that the same agreement that they made with the British Marconi included everything for radio purposes. That included devices and everything of the kind. So that the one agreement included and set up the pool and was part of the very pool as it was originally organized, and it is the very part of the pool at the present time. That is why they accumulated the 10,000 patents that they have in this pool.

"Now, when they got these agreements then they gave—subsequently after criticism in Congress of the policy of RCA then they started to give licenses, and Zenith was the first one to take a license. At the outset I think they charged something like —I know of five per cent, because that came up before a Committee of Congress and was criticized in Congress because of the amount that they charged, and they not only charged on their particular patents, but they charged also on the cabinet that went over in which the radio was encompassed. In that agreement they limited Zenith and all of the rest of the companies in the United States to the United States alone. Why did they do that? Because of the fact that they had given the exclusive licenses to the British, to the French, to the Dutch, and to the Germans, and so they said to every American 'You cannot go in and set up a manufacturing plant, nor can you sell your products in Great Britain,

Germany, France, Czechoslovakia, Holland, or any other country'.

"We talk about the bad effects of a high tariff. Here was an instrument that excluded, definitely excluded every manufacturer in this country from extending its business, and also excluded any German company, any French company, or any English company from coming over here and selling its products in the United States.

"The Court: How about Tahiti and the Fiji Islands?

"Mr. Wheeler: The Fiji Islands, let me say, was part and parcel of the pool, was part and parcel of the pool that was set up, and the Fiji Islands is not important excepting in the sense that it was part and parcel of the whole scheme that was set up.

"Then they came along until 1932. They say they purged themselves in 1932. Well, first of all, they did not purge themselves in 1932. First of all, they did not purge themselves because of the fact that in their contracts they did not purge themselves of a division of the field, nor did they purge themselves of the division of the territories; and where they set up and divided the territories the Supreme Court of the United States has repeatedly held that a division of the territories is a violation of the Sherman Anti-Trust Act [15 U.S.C.A. §§ 1–7, 15 note], likewise a division of the field. They did not purge themselves of that.

"Secondly, these contracts contain funneling provisions which the Supreme Court of the United States has repeatedly said, and Judge Knox has said in the Carboloy case [U. S. v. General Electric Co., D.C., 80 F.Supp. 989], that where there is a funneling provision in an industry that dominates that industry, and that is of itself a violation of the Sherman Anti-Trust Act; and in the Transrap case [Transparent Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563] Justice Douglas said that in that particular case where it was a small matter and they did not dominate the industry, he said that was not a violation of the Sherman Anti-Trust Act per se, but he was explicit to say that where it was an industry

that was dominated it would be a violation of the Sherman Anti-Trust Act.

"As Mr. Adams has pointed out, every one of these contracts contains that funneling provision, and they contain that funneling provision even after the agreements expire.

"Secondly, they did not purge themselves of prohibiting the American companies from engaging in the manufacture of radio sets in England or in these other countries.

\* \* \* \* \* \*

"Mr. Bickford: I thought I might say a few words to you, your Honor, addressing myself to what I consider is the purpose of this visit here, and that is to try to find some way of making this case manageable from the standpoint of the Court and the parties.

"As stated by our friends the plaintiffs the case is simply unmanageable and we are striving to make it manageable and bring it down to the issues that are real, the real issues between the parties, and that is simply the enforcement or threatened enforcement of patents which the plaintiff claims will injure it in its business if they were enforced against it. That is the real issue.

"The defense that has been pleaded and which I assume they will try to prove is, as Mr. Adams has stated, a simple misuse of patents. He says by violation of the antitrust laws, but it is a misuse defense no matter what he calls it by addition and explanation as to what the acts were which he claims constitute the misuse.

"Now, if any misuse still exists it must be apparent from evidence of things that are actually going on—and you should not have to go back to 1919 and probe the intentions and purposes of the parties in making agreements such as Senator Wheeler has outlined to you—if there is any contemporaneous misuse it must be apparent now. It does not make any difference whether that amounts to the stature of an antitrust violation or whether it is something less than that. But even if the antitrust violation were in the case and if it were an antitrust defense as distinguished from something else, that alone does not assist the plaintiff nor assist the Court or us in arriving at the solution that we are here to try to arrive at.

An antitrust violation *per se* in private litigation is not a defense to a case. That antitrust violation must be directly related to some injury or threatened injury to the plaintiff. Accordingly, purported defenses of this kind have been held inapplicable in actions of private litigation where contractual obligations, statutory remedies, and so forth, are in issue.

"The notable case is Bruce's Juices case [Bruce's Juices, Inc., v. American Can Co., 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219] decided last year or the year before in the Supreme Court where an antitrust violation was held to be no defense on a contract right. Here the antitrust violation with respect to patents not in issue can have no relevancy to the complaint that the plaintiff has made here in a declaratory judgment action that certain patents are being threatened to be enforced against them and in his reply by saying that the defendants should be enjoined from asserting these patents.

"So I reach the point of why we are here. We are here, as I said before, to try to cut down the preparation for trial and the issues in the trial and the evidence in the trial to that which is really relevant to the cause of action pleaded in the complaint and the reply and to the patents which the defendants have concededly threatened against the plaintiff.

"Now, concretely, your Honor, if you will look at the index to these interrogatories it is not until Interrogatory 355, appearing on page 6 of the index, under item XVIII, that anything subsequent to 1932 is sought. Everything on page 1 is 1919. Everything on page 2 is 1919. Everything on page 3 is 1921. On page 4 item VIII is 1920; item IX is 1925; item X is 1923. On the next page item XI is 1926; item XII is 1929; item XIII is 1930; and the first four items on page 6 are 1932, and 1932 is the time when the consent decree in the Government's suit which alleged all these things with which the earlier interrogatories are concerned was entered into. I don't think that it lies well in the mouths of the plaintiffs here to say that the Government was overreached in that suit. The Government was represented by four different Assistant Attorneys General: John Lord O'Brien,

Judge Olney, who was special counsel brought in from California, and two others over a long period of time; and Judge Nields in this Court has held that that decree was entered into in the public interest. The mere fact that subsequent Assistant Attorney General Thurman Arnold made the bald statement in this Court that it was not in the public interest can have no effect here where the Court before whom that remark was made said that that was insufficient to establish the fact.

"So I ask your Honor at least in this situation here where we are now to strike out those interrogatories prior to 1932 which I have indicated, and, as I say, to me it doesn't make any difference whether they say this is a misuse defense because of an antitrust violation or a misuse defense because of some other thing. I still think that for the purposes of this hearing we should be able to arrive at a sensible cutting down of the work involved and that we have proposed to your Honor a sensible plan and a workable solution such as Mr. Nields has outlined to you and such as I have added to in the striking out of these interrogatories at least down to 1932.

"The Court: Mr. Adams, our discussion this morning has been about the interrogatories. At least that has been the basis of our approach. We have left that field to a certain extent. During the recess I checked with the Clerk and you have no motion before me for trial of the separate issue under Rule 42. Do you propose to file one?

"Mr. Adams: Well, it had not occurred to us, your Honor. I did not know that that kind of issue was being presented.

"The Court: I thought you wanted that tried first. I thought you and Senator Wheeler suggested—

"Mr. Adams: What we were saying, your Honor, was the other side had this morning said to your Honor that they wanted the patent issue tried first and were asking for a date, and we were countering that by saying it seemed to us that that was out of order, that the real thing to be tried first was the other issue because that was the one which would dispose of the case.

"The Court: Then maybe, Mr. Nields, you ought to file a motion for separate trial of the patent issues?

"Mr. Nields: Perhaps I should.

"The Court: Then I could make definitive ruling on that.

"Mr. Nields: We would be happy to file that.

"The Court: And it may be that that would need be disposed of either for or against you before I come to the interrogatory question.

"Mr. Adams: Well, if I may say a word on that, it would seem to us that whichever aspects of the case were tried first it would still have to go ahead with discovery on the other issues, because, as we said, even if we establish—

"The Court: Not necessarily. If we try the patent question first and I find the 40 patents which the defendants apparently rely on to be invalid, you go home happy.

"Mr. Adams: No, we don't, your Honor.

"The Court: No?

"Mr. Adams: No. That is just the point.

"The Court: What do you want, perpetual insurance against litigation? Very few people have the ability to enjoy that attribute.

"Mr. Adams: That is the case we pose to your Honor, is that here is an illegal scheme being used against us and we want relief from it. As I said to your Honor, it is not merely the patents that they pick out. We like any other manufacturer change our apparatus. We are in business. They have patents, as I say, that come up every week. Some of them come from these foreign agreements, some out of their mutual agreements here in this country, and some of them out of the laboratories they maintain out of the millions of dollars they collect from the industry under this scheme, and I mean it, millions every year which they use to perpetuate the scheme. Now, we are not content to just take their say-so on a particular patent that they choose to assert against us by counterclaim. We want freedom in our business from this vicious scheme, and I say the way we will

be happy is when they purge themselves of it."

Defendants' position was made clear by the following:

"The Court: Mr. Nields, clear this for me, please. Is your frame of reference as far as this litigation is concerned 1932–1951 or December 1946–1951?

"Mr. Nields: My frame of reference from the point of view of time within which these misuse issues could be relevant, if they existed, is December, 1946, to the present, but I go back a year of that to give leeway and perspective to whatever facts there may be. From the point of view of the pool, however, I don't think that plaintiff is concerned with anything except what existed as of the day the suit was brought. That is not a distinction with much of a difference, but it is just that you either have a pool or you don't and it is either legal or it is not legal. So that from the standpoint of RCA's ownership from the point of view of time I think the Court is concerned only with the state of facts as of the date the suit was brought and thereafter, but I also wish to point out in that connection that when we give the plaintiff and when the plaintiff chooses to give you the facts with respect to our ownership of patents as of the date the suit was brought, to all intents and purposes the plaintiff automatically goes back to 1932, because the major agreements of which the plaintiff complains were entered into as a result of the consent decree entered by this Court in 1932. So that from the point of view of this great conspiracy to pool patents and all of that, my very I hope accurately worked out logic still lets the plaintiff go back to 1932.

\* \* \* \* \* \*

"We calculate that if we assume that the alleged patent pool had a total of 5,000 patents for each of these 30 odd years the interrogatory would call for 150,000 separate items, most of which would deal with patents which have long since expired and with patents that have nothing to do with home receivers.

"Interrogatory 356 asks for a total of over one million additional items with respect to patents, most of which are long since dead, and most of which have nothing to do with home receivers.

"The Court: Do I understand you correctly? You say one million items?

"Mr. Nields: One million items it would call for. Now, these items, your Honor, would be duplicates in a large part, because he is asking for us to list across the board the patents we owned each year, so that there would not be one million separate answers, there would be a million separate items, many of which would be repetitious. But that would give your Honor, in my judgment, a fair view of the scope of these interrogatories, and of the lengths to which plaintiff seeks to go, as we respectfully submit, to no useful end so far as establishing the enforceability of the patents in suit is concerned.

"In addition, if your Honor would turn to Interrogatory 418 and 419 you will find that we are asked to list all the patents owned by A T & T, Western Electric, Bell Laboratories, GE and Westinghouse which contain a claim or claims identical or substantially identical to the claim or claims contained in any other patent owned by any of these companies. We would not know how to go about answering such an interrogatory. If there are identical claims apparently the Patent Office didn't find them. The patents are equally available to the plaintiff, and who is to say what claims are substantially identical, and to what end?

"I would like to have your Honor keep in mind that it is not any part of the purpose of this pretrial to limit any issue with respect to the validity and infringement of the patents in suit. If the plaintiff can establish or thinks he can establish that they have claims identical with each other or what not, that is completely another matter. This is a part of this large alleged misuse defense, which we respectfully submit has sprawled all over the place, way beyond what this Court or the defendants should be called upon to cope with.

"It is not feasible to go through all the interrogatories and all the subdivisions and show why they are improper, and it is not my understanding that that is what your Honor wishes to discuss at this time. We do wish to emphasize through the inter-

rogatories, however, that the scope of the misuse defense should and must drastically be cut down, (a), in point of time to our use of patents since January 1, 1946, and our ownership of patents as of the date the suit was brought, in each case home receiver patents, and from the point of view of the subject matter to our use of the patents in suit and our ownership of home receiver patents."

The plaintiff stated its position at length:

"Mr. Adams: At the outset let me say, your Honor, that it seems to me the real difficulty we are having here is that the defendants are really trying to avoid meeting what we consider the issue tendered by Zenith in its complaint. In re-reading the discussion we had before I was very much struck by the statement which was made when we pointed out that there was no surprise at all to the other side that that was the issue tendered. I in fact quoted one of the counsel as accusing us of having brought that issue into the Court, and then I think it was Mr. Nields interrupted and said 'Yes, but it is our purpose to knock that issue out of the case.'

"Now, that seems to me to be a very fair statement of what they are attempting to do. The issue is in their case and what they are attempting to do by a pretrial conference is to knock it out of the case so that they won't have to meet it. Now, I think they do that by the familiar device of anybody that is accused of unethical conduct, and that is they try to divide it into a lot of parts and say as to that part you see nothing wrong and as to this part you see nothing wrong, and they try to avoid facing the whole picture. It seems to me that is the essence of it.

"They keep talking about limiting it to patents. It is not the kind of controversy we tendered, and let me try to crystallize it in this way:

"If we are right about this and if the evidence which we have asked them to produce and which I might say is wholly in their possession, not ours, I would imagine that the Court would enter a judgment substantially as follows:

"Zenith is a radio manufacturer in the business of making and selling broadcast apparatus in this country and abroad. The defendants have asserted and threatened to assert against Zenith and its jobbers and dealers and customers a mass of undisclosed patents.

"The Court: Is that accurate?

"Mr. Adams: That is what we allege and I believe it is true. That is specifically alleged in the complaint.

"The Court: In other words, you say we go beyond the limitation of 40 patents as suggested?

"Mr. Adams: The 40 patents have nothing to do with it, your Honor. That is a separate controversy."

1. The crux of the matter is RCA is confronted with an investigation into its entire corporate life since 1919 to the present, circa 1952. It is, indeed, difficult to appreciate such an investigation when the main problem for determination calls for a consideration of a misuse defense to specific patents (40) which defendants seek to enforce against specific apparatus. The theory urged by plaintiff, I conclude, should not be a precedent, for no corporation of any size would be able to sue an infringer unless it opened up its corporate files from the date of its charter existence and was made to answer searching and minute inquiries about transactions which could be ancient. From the paper record, I see RCA was organized in 1919, at the request of the Government, so as to provide an American transoceanic radio communication service. In order to accomplish this, various patent licenses and cross-licenses were necessary. This brought into the picture A T & T, WE, GE and others. All of this administration has been examined in the past by various Governmental Agencies. This brings into focus facts of critical significance. For example, RCA's patent position was investigated, as is found in a report of the Federal Trade Commission (December 1, 1923), which resulted in a complaint filed by FTC on January 24, 1924; FTC dismissed the complaint on December 19, 1928. In fact, in this Court the United States brought an action against RCA, A T & T,

576

WE, GE and others (our No. 793 in Equity). That litigation resulted in a consent decree, filed November 21, 1932. Supplemental consent decrees were entered on May 25, 1934 and June 2, 1935. Then, on July 31, 1942, Assistant Attorney General Thurman Arnold moved, in this Court, to vacate those decrees without prejudice to the Government. Circuit Judge Maris was especially assigned to determine the application. He refused the Government's position and left the consent decrees undisturbed. See United States v. Radio Corporation of America, D.C.Del., 46 F.Supp. 654. An appeal was taken to the Supreme Court, but the appeal was dismissed on the motion of the then Solicitor General. See 318 U.S. 796, 63 S.Ct. 851, 87 L.Ed. 1161. It is to be noted that 45 of the 50 agreements which plaintiff wishes to bring, once again, before this Court, for legal examination, were in existence before the consent decrees. All 50 agreements were known at the time of the Government's motion to vacate the consent decrees.[8]

■ 2. Ownership of patents—regardless of number—does not constitute misuse. Counsel have drawn the distinction between a misuse defense and issues which arise in an antitrust action. A misuse is a specific defense to an infringement suit, or an action for royalties, and the considerations there involved are different from those in the orthodox antitrust suit. The law of misuse involves unlawful extension of the lawful monopoly conferred by the patent. Morton Salt Co. v. G. S. Suppiger Co., 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 62 S.Ct. 406, 86 L.Ed. 367; Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376; Mercoid Corp. v. Minneapolis Honeywell Regulator Co., 320 U.S. 680, 64 S.Ct. 278, 88 L.Ed. 396. There are differences between a government antitrust suit, a private one, and a misuse defense as to the holder of a patent. These differences are not merely doctrinal. They depend upon the facts of

each case. No private litigant has the right to take upon himself the role of the Attorney General in the enforcement of the antitrust laws. If such was fact, the legal life of the judiciary would be intolerable.

■ It is the Attorney General who applies for enforcement of the antitrust laws in the public interest. When the private litigant sues, he must establish his right to redress for the particular wrong done to him.

■ The task, here, is made easier by a concession made by RCA. It is willing to have the scope of the issues include its use of the patents in suit since 1946 with respect to any apparatus in controversy. It makes this concession, however, without prejudice to its position that its use of such patents with respect to apparatus other than the home receivers is irrelevant. The issues, then, with respect to RCA's ownership of patents should be confined to all license agreements for the manufacture and sale of home receivers under home receiver patents as of January 1946. This, of course, also covers any discussion of ownership of home receiver patents.

■ 3. Misuse issues are different from validity and infringement. The documentary proof is different. I conclude a trial of both issues would impose a heavier burden than one has the right to ask of any single judge.[9] This present complex litigation comes precisely within the authorization of F.R. 42(b). In fact, in infringement suits of lesser complexity antitrust or misuse issues have been separated for trial apart from patent issues. For example, in Container Co. v. Carpenter Container Corp., D.C.Del., 9 F.R.D. 89, 91–2, my colleague Judge Rodney said:

"It seems clear that the issues, proof and witnesses in the anti-trust claim are substantially different from and foreign to the issues, proof and witnesses in the patent infringement claim. * * *

8. Plaintiff's desire to probe into the corporate history of defendants shows it is not until page 126 of the 166 pages of interrogatories plaintiff reaches the matter which was argued before and decided by Judge Maris.

9. See fn. 7, supra.

"Rule 42(b) justifies separation to further convenience or avoid prejudice. Since it appears from the record that the issues, proof and witnesses will be substantially different for each claim, the convenience of both the parties and the court will be served by separation. Insofar as Container and Continental are concerned, counsel trying the antitrust claim will not try the patent infringement claim, and Continental is not concerned as a party with the latter claim. Convenience to these parties would thus be served by separation for this reason also."[10]

As I remarked in Canister v. National Can Corp., D.C., 3 F.R.D. 279, at page 280:

"I am fully aware that issues should not be tried piecemeal unless necessary to prevent undue delay or to promote the interest of justice. Rickenbacher Transp. Inc. v. Pennsylvania R. Co., D.C., 3 F.R.D. 202. But, in the case at bar, it is obvious the interest of the parties will best be served by ascertaining if we have a contract upon which an action may be maintained before we direct our attention to the large issues of breach and damages. Hence, defendant's motion under Rule 42(b) is granted."

In Hazeltine Research, Inc. v. Automatic Radio Mfg. Co., Inc., D.C., 77 F.Supp. 493, 498, Hazeltine sued Automatic Radio on a patent licensing agreement for royalties and an accounting. Automatic interposed various "misuse" defenses. Both parties moved for summary judgment. Hazeltine's motion was granted. Automatic Radio's was denied. The District Court said:

"Defendant's most substantial defense is that set forth in paragraph 10 of its answer to the complaint: 'That the plaintiff, in an illegal endeavor to eliminate all competition and secure an unlawful monopoly in violation of the antitrust laws of the United States, acquired the approximately 425 United States letters patent and the approximately 120 applications for United States letters patent * * * from its employees * * *' (and from other corporations and persons). If the issue of whether a monopoly existed was relevant to this case, I would not decide the question on summary procedure, but would require that it be submitted for trial. However, in this case, it is not necessary to decide the question. The license contract involved here is entirely separate from any action of plaintiff to eliminate competition or engage in a monopoly. Assuming, arguendo, it was engaged in an unlawful scheme to maintain a monopoly, the contract here was not an integral part of it. The contract in suit did not help to promote any monopoly plaintiff had established. See American Refining Co. v. Gasoline Products Co., Tex.Civ. App., 294 S.W. 967. The contract here is complete in itself and enforceable without reference to any contract of the plaintiff with others or of any illegal activity on the part of plaintiff in violation of the anti-trust laws. It being itself a valid contract, collateral activities of the plaintiff do not render it unenforceable. Gasoline Products Co., Inc. v. Champlin Refining Co., D.C., 46 F.2d 511, 514; Walker on Patents, Vol. II, Sec. 409, p. 1590, and cases; cf. Radio Corporation of America v. Majestic Distributors, D.C., 53 F.2d 641. (Compare United Shoe Machinery Co. v. La Chapelle, 212 Mass. 467, 99 N.E. 289, Ann.Cas. 1913D, 715, where the contract in issue was held to be an essential means of maintaining the illegal monopoly of plaintiff.) The defense that plaintiff is using its patents to force others, not the defendant, to assign to plaintiff rights under their patents is rejected on the same ground."

The Court of Appeals affirmed, 1 Cir., 176 F.2d 799, 805–6. Chief Judge Magruder wrote:

10. Compare Society of European Stage Authors v. WCAU Broadcasting Co., D. C., 35 F.Supp. 460; Hall Laboratories, Inc. v. National Aluminate Corp., D.C. Del., 95 F.Supp. 323; Stewart-Warner Corp. v. Staley, D.C., 2 F.R.D. 446, 447.

" *. * * From Automatic's somewhat nebulous generalizations, it is difficult to ascertain the precise nature of its argument on this score, though it does concede that the mere accumulation of patents, however great in number, is not illegal per se. Cf. Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 1947, 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. * * *

" * * * The district court correctly ruled that, even assuming arguendo that Hazeltine was engaged in an unlawful scheme to maintain a monopoly, the license contract in suit was not an integral part of it; that the license agreement, being itself a valid contract, will not be rendered unenforceable by collateral activities of the plaintiff in violation of the anti-trust laws. 2 Restatement, Contracts § 519 (1932); 5 Williston, Contracts § 1661, Rev.Ed.1937; 2 Walker, Patents § 409, Deller Ed., 1937. See, also, Bruce's Juices, Inc., v. American Can Co., 1947, 330 U.S. 743, 754, 755–756, 67 S.Ct. 1015, 91 L.Ed. 1219. Morton Salt Co. v. G. S. Suppiger Co., 1942, 314 U.S. 488, 62 S.Ct. 402, 86 L.Ed. 363, is no authority for the proposition that a contract action for patent royalties may be bogged down by the defendant into a complicated and protracted trial of asserted collateral infractions of the anti-trust laws. And see Radio Corporation of America v. Majestic Distributors, D.C. Conn., 1931, 53 F.2d 641, 642–643, and cases cited."

The Supreme Court affirmed (6 to 2) in Automatic Radio Manufacturing Co., Inc. v. Hazeltine Research, Inc., 1950, 339 U.S. 827, 70 S.Ct. 894, 898, 94 L.Ed. 1312. This is the most recent decision on misuse of patents. Mr. Justice Minton indicated the Court's view:

"The mere accumulation of patents, no matter how many, is not in and of itself illegal. See Transparent-Wrap Machine Corp. v. Stokes & Smith Co., 329 U.S. 637, 67 S.Ct. 610, 91 L.Ed. 563. And this record simply does not support incendiary, yet vague, charges that respondent uses its accumulation of patents 'for the exaction of tribute' and collects royalties 'by means of the overpowering threat of disastrous litigation.' We cannot say that payment of royalties according to an agreed percentage of the licensee's sales is unreasonable. Sound business judgment could indicate that such payment represents the most convenient method of fixing the business value of the privileges granted by the licensing agreement. We are not unmindful that convenience cannot justify an extension of the monopoly of the patent. See, e. g., Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 666, 64 S.Ct. 268, 271, 88 L.Ed. 376; B. B. Chemical Co. v. Ellis, 314 U.S. 495, 498, 62 S.Ct. 406, 408, 86 L.Ed. 367. But as we have already indicated, there is in this royalty provision no inherent extension of the monopoly of the patent. * * *" 339 U.S. 834, 70 S.Ct. 898.

There is no attempt, here, to prevent appropriate discovery either as to the patent issues or misuse issues. RCA has said—I think correctly—it has at no time requested the court to enforce any patent, at least, not until after the misuse issues have been tried. Plaintiff's authorities that courts will not enforce patents until misuse issues have been disposed of, do not meet the question as to the order in which courts may try the various issues presented. Enforcement of a patent concerns the misuse defense—this means, there is discretion in the court as to the order in which validity, infringement or enforceability may be tried. Plaintiff's argument rests on the proposition that there is a continuing and unpurged misuse. RCA's position is it has never sought to prevent plaintiff from having the opportunity to establish this defense. This certainly was my understanding of what occurred at the pretrial conferences. The fact is RCA is ready and willing to meet any relevant misuse defense at the proper time and as to the specific patents it claims are infringed. This means it is willing to have the present scope of the misuse defense encompass RCA's administration of its patents, i. e., licensing, litigation or other assertion of all patents with respect to home receivers.

Moreover, RCA does not seek to avoid the issue testing the legality of a "patent pool" or various techniques of "funneling".

As to the *use* or *misuse* of RCA's patents, I conclude plaintiff's defense to the counterclaim charge of infringement should not be concerned with activities prior to 1946. The earliest date upon which RCA rests to enforce its specific patents in suit is December 1946. Nevertheless, I think it necessary to go back to January 1946 to determine if there is any unpurged misuse of patents by virtue of RCA's administration of its patent rights prior to December 1946.

■■■ The blueprint for the progress of this litigation should take the following course: Matters relating to patents not in controversy and to the use of patents which are not in suit are not relevant prior to 1946. Consequently, a pretrial order should exclude proof of matters not relating to what has been done with the patents since plaintiff determined not to renew its license in 1946. A declaration may be made, here, with respect to the patents which defendants allege to be valid and infringed by plaintiff's specified apparatus, but no other patents and apparatus should be embraced in any judgment to be entered. The trial should proceed on the basis of an examination of the questions involving infringement and validity and, if counsel will make proper application, the issues involving misuse may follow immediately thereafter; and, before any order is entered directing that any of defendants' 40 patents should be enforced by the injunctive process, or by a finding for damages.